Beth Ann JOHNSON, Mother of Emily
Johnson, Deceased Minor Child,
Appellant–Plaintiff,

v.

Lance JACOBS, Steven J. Cummings,
Stacy Cummings, Lawrence County
Board of Aviation Commissioners,
Tony Newbold, Lawrence County
Commissioners, Appellees–Defendants.

No. 47A01–1102–CT–35.

Court of Appeals of Indiana.

Oct. 20, 2011.

Matthew J. Schad, Schad & Schad, P.C., New Albany, IN, Attorney for Appellant.

David L. Ferguson, Ferguson & Ferguson, Bloomington, IN, Jill Jennings Drzewieki, Tressler LLP, Chicago, IL, Attorneys for Appellees.

Elaine D. Solomon, Blank Rome LLP, Philadelphia, PA, Attorney for Lawrence Co. Board of Aviation Comm.

## OPINION

BAKER, Judge.

Eric Johnson and his estranged wife, Beth, were in the midst of a divorce. Eric was taking flight lessons and in March 2007, he took Emily, their eight-year-old daughter, on a solo airplane flight in Lawrence County. Lawrence County consists of 448 square miles with a population of nearly 46,000. Eric crashed the plane into Vivian Pace's house, killing himself and Emily. Pace is Beth's mother, and her residence is one of approximately 18,500 in Lawrence County.

Beth sued the Lawrence County Board of Aviation Commissioners (Aviation Board), Eric's Flight Instructor, Tony Newbold, and the Lawrence County Commissioners (collectively, the appellees)

seeking damages for Emily's wrongful death. Summary judgment was entered for all defendants. The undisputed designated evidence contained in the record establishes that Eric intentionally flew the airplane he had rented into his mother-in-law's house. Thus, any negligence that might be attributed to the defendants was superseded by Eric's intentional acts of flying the airplane into the residence and killing Emily.

Appellant-plaintiff Beth Ann Johnson, the mother of Emily, a minor child, now deceased, appeals the trial court's grant of summary judgment in favor of the appellees. Beth argues that the designated evidence did not establish, as a matter of law, that Eric committed suicide and intentionally killed Emily when he flew the airplane into the house.

In the alternative, Beth argues that even if it could be assumed that Eric's acts were intentional, the trial court erred in determining that the misuse of an aircraft was not a foreseeable consequence of the airport's non-existent security procedures.

Concluding that the trial court properly entered summary judgment for the appellees because Eric's intentional acts were a superseding intervening cause between any alleged negligence of the appellees and Emily's death, we affirm.

## FACTS

Eric and Beth were married on June 18, 1994. Emily, their only child, was born on February 16, 1999. In June 2006, Beth filed a petition for dissolution of marriage. The following month, Eric threatened Beth and held her at gunpoint for an entire night. As a result, Beth obtained a restraining order against Eric.

Pursuant to the dissolution decree, the Johnsons agreed to joint custody of Emily. However, Beth maintained physical custody of Emily. After the divorce, Eric told Beth on several occasions that he would not permit her to take Emily away from him.

Eric began flight lessons sometime in July 2006 and completed his first solo flight on January 20, 2007. During the last week of February 2007, Eric took Emily to Cancun, Mexico, for a vacation. On March 1, while still in Cancun, Eric called Beth. Eric became upset and argumentative with her when he discovered that Beth was in Florida with her new boyfriend, Dean Winegardener. The next day, Eric told his friend, Brenda Cooper, that he thought Beth and Winegardener were going to take Emily away from him.

As part of an agreement that permitted Eric to take Emily on that vacation, Eric was supposed to take Emily to school on March 5, 2007. However, sometime before March 5, 2007, Eric made a reservation to rent a Cessna airplane from a Flight Services company at Grissom Airport. On March 5, Eric sent a Limestone Girls Club Donor Brick and Block Program Form and a check for $500 through the mail to the Limestone Girls Club in Bedford. The form requested a brick be engraved "Emily and Eric Johnson 3–1–07." That same day, Eric emailed the school and informed Emily's teacher that she would be late. Beth learned about the email only after she called the school.

Rather than taking Emily to school, Eric went to Grissom Airport at approximately 8:45 a.m. and retrieved from Lance Jacobs, an airport employee, some keys for one of the airplanes. Eric arrived at the airport building alone, and Jacobs recognized Eric from a photograph on the wall, demonstrating that Eric was Newbold's student. Jacobs knew that it was routine policy for student pilots to retrieve the keys to the hangar, pull out the airplane, and wait for the instructor to join them. On this occa-

sion, Eric refused Jacobs's offer to assist him with the hangar doors.

Approximately ten minutes later, Jacobs heard a plane's engine start. Mike Sipes, a private pilot who was at the airport, walked into the building. Sipes mentioned that he had seen a little girl run up to a plane outside. Jacobs then picked up some binoculars but could not see anyone other than the pilot in the plane. At approximately 9:00 a.m., Eric took off in a Cessna Airplane with Emily as his passenger. At some point prior to this time, Newbold had communicated to Eric that his personal rule was that his students were to have three supervised solo flights before he would "sign-off" on unsupervised flights. Appellees' Joint App. p. 84.

During the flight, Eric attempted to call Beth three times on her cell phone. Approximately one hour and fifteen minutes into the flight, Beth answered Eric's third telephone call. Eric was angry and yelling and cursing during the conversation with Beth. Eric called Beth a "bitch" and "whore," and told her that he would see her and Winegardener "in hell." *Id.* at 31.

Emily also talked to Beth on the phone and told her mother to come get her. After Beth indicated that she was on her way, the phone lost its signal. *Id.* Because Beth thought that Eric was going to kidnap Emily, she went to the Bedford Police Department and reported the incident. At approximately 10:35 a.m., Ryan Patterson was at Grissom and saw the plane that Eric was flying. Although Patterson thought that the plane was going to land on one of the runways, it had the wind at its tail, which was contrary to the protocol for landing planes at Grissom. Patterson also noted that the Cessna's landing flaps were not down. Patterson then saw the Cessna fly at a 45 degree angle toward the ground and believed that the Cessna had crashed.

While Patterson was watching the airplane, Greg Rollins—a private pilot with nearly 250 hours of flight experience—was also watching from his driveway in Bedford. Rollins noticed that the plane's flaps were not in the correct landing position. Rollins then heard the Cessna's engine throttle increase approximately 500 feet past his house. Rollins observed the Cessna bank "hard left and nose down." Appellees' App. p. 69. Although Rollins lost sight of the aircraft, he heard the impact of the Cessna crash into Pace's residence. Rollins opined that the plane looked like it was going to fly into the house. The NTSB investigated the crash and issued a report that suicide was the probable cause of the crash.

On June 6, 2008, Johnson filed an action for wrongful death against the Aviation Board, and several of its members,[1] and the Lawrence County Commissioners. The Complaint alleged that the appellees were liable for Emily's death because

9. All of the above named defendants knew or should have known that Eric Johnson was a student pilot, that as a student pilot he was not qualified and was not certified to start, to taxi, or to control an air craft without a certified

---

1. The Aviation Board is comprised of four unpaid individuals who are appointed by the Lawrence County Board of Commissioners. The Aviation Board did not operate Grissom Airport or maintain any physical presence at the airports. It did not rent aircraft or provide flight instruction. The Aviation Board had contracted with appellee Cummings to serve as Grissom's manager and Fixed Base Operator for the airport. Appellees' App. p. 127. Cummings rented the airplane that he co-owned with his brother, Stacy, to those who took flying lessons. The student pilots, including Eric, coordinated their flying lessons with private instructors, including Newbold. *Id.*

flight instructor being aboard at all times.

10. All of the above named defendants knew or should have known that Eric Johnson was a student pilot, that as a student pilot he was not qualified and not certified to take a passenger on board while he was piloting an airplane.

Appellees' App. p. 2–3.

On August 20, 2009, the Aviation Board filed a motion for summary judgment, claiming that any negligence that might be attributed to the Aviation Board was superseded by Eric's intervening act of murdering Emily. The trial court heard argument on the motion on March 9, 2010, and ultimately granted summary judgment in the Aviation Board's favor on May 12, 2010. The trial court ruled, among other things, that it could "not find any issue of material fact ... that leads to any conclusion other than this was an intentional act by Eric Johnson to kill himself and his daughter." Appellant's App. p. 12. Thus, the trial court concluded that Johnson's conduct was a superseding intervening cause that broke the chain of causation.

On June 25, 2010, the Lawrence County Commissioners filed its motion for summary judgment, claiming that there was no genuine issue of material fact with regard to foreseeability, proximate cause, and intervening, superseding cause. On January 18, 2011, the trial court granted the Commissioners' motion, stating:

[T]his was an intentional act by Eric Johnson to kill himself and his daughter. Said act resulting in a superseding intervening cause that broke the chain of causation between any alleged negligence the Defendants may or may not have and the Plaintiff.

. . .

In the alternative, ... Plaintiff relies heavily on the Transportation Security Administration, Security Guideline for General Aviation Airports, Information Publication A–100 (May 2004). Upon review of that document, the court finds that it does not contain any regulatory language nor is it intended to suggest that any recommendations or guidelines should be considered a mandatory requirement creating any sort of duty, nor does the Plaintiff allege this in their complaint. With no duty alleged or none to be found there can be no breach.

Appellant's App. p. 16. Beth now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Our standard of review for summary judgment is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Tom–Wat, Inc. v. Fink*, 741 N.E.2d 343, 346 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Id.* Also, review of a summary judgment motion is limited to those materials that are designated to the trial court. *Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind.2001). We may affirm the grant of summary judgment on any basis argued by the parties and supported by the record. *Payton v. Hadley*, 819 N.E.2d 432, 437 (Ind.Ct.App.2004).

### II. Johnson's Contentions

#### A. Proximate Cause of Emily's Death

Beth argues that the trial court erred in granting the appellees' motions for summary judgment because the trial court erroneously concluded that Eric committed suicide and murdered Emily. Instead, Beth argues that there is a genu-

ine issue of material fact because the designated evidence also supports the reasonable inference that the "aircraft crash that killed Emily ... and her father was simply a tragic accident." Appellant's Reply Br. p. 3.

 In resolving this issue, we initially observe that to recover for negligence, a plaintiff must establish: (1) a duty on the defendant's part to conform his conduct to a standard of care arising from his relationship with the plaintiff; (2) a failure on the part of the defendant to conform his conduct to the requisite standard of care; and (3) an injury to the plaintiff proximately caused by the breach. *Van Duyn v. Cook–Teague Partnership,* 694 N.E.2d 779, 781 (Ind.Ct.App.1998). An indispensable element of an action for negligence is that the act complained of must be a proximate cause of the injury. *Rice v. Strunk,* 670 N.E.2d 1280, 1284 (Ind.1996). To be considered a proximate cause, the negligent act must have set in motion a chain of circumstances which, in the natural, probable and continuous sequence, led to the resulting injury. *Merchants Nat'l Bank v. Simrell's Sports Bar & Grill, Inc.,* 741 N.E.2d 383, 389 (Ind.Ct.App.2000). And foreseeability of injury is regarded as an essential element or fundamental test of proximate cause. *Johnson v. Bender,* 174 Ind.App. 638, 369 N.E.2d 936, 939 (1977).

 A willful, malicious criminal act of a third party is an intervening act that breaks the causal chain between the alleged negligence and the resulting harm. *Merchants Nat'l Bank,* 741 N.E.2d at 389. Although proximate cause is generally a question of fact, proximate cause becomes a question of law where only a single conclusion can be drawn from the facts. *See Havert v. Caldwell,* 452 N.E.2d 154, 159 (Ind.1983).

As set forth above, the undisputed designated evidence in this case established that Eric should have taken Emily to school on March 5, 2007. Instead, he took Emily to the airport, went alone into the airport building to retrieve the keys, refused assistance from the airport employee, put Emily in the airplane, and commenced a flight lasting approximately one and one-half hours. Appellees' App. p. 58. Eric also circumvented his instructor's rule of three supervised solo flights before an unsupervised flight could commence. Appellant's App. p. 29.

The designated evidence also shows that Eric did not notify his instructor of his intention to fly on the date of the murder and his scheduling of an airplane rental despite his instructor's personal rule that student pilots should complete three supervised solo flights prior to completing unsupervised solo flights. Appellees' App. p. 37.

Eric attempted to contact Beth on her cell phone, and he made angry and threatening statements when he reached Beth on the third attempt. At some point during the conversation, Eric told Beth that she would never see Emily again. *Id.* at 31, 41, 64. Just before the plane crashed into Pace's house, two bystanders witnessed the airplane abruptly angle downward and throttle its engines toward the ground, without taking the normal steps to prepare for landing, such as deploying flaps, reducing speed, and shallowing descent. *Id.* at 67–69. Eric crashed the airplane into the house shortly thereafter. As noted above, Pace's residence was one of 18,500 houses in Lawrence County.

Eric sent a check for $500 in the mail to a local youth club for a commemorative brick, to be inscribed with both Emily's and his name and a date. Appellees' App. p. 51–56. The NTSB's investigation determined that the crash was a murder-suicide. Both the Indiana State Police and

Bedford Police considered the incident a murder-suicide. *Id.* at 127.

In light of the above, we conclude that Eric's intentional criminal actions triggered the intervening, superseding cause doctrine and broke the causal chain between the Aviation Board's alleged negligence and Emily's death. *Merchants Natl. Bank,* 741 N.E.2d at 389. Thus, we agree with the trial court's determination that none of the actions or inaction of any of the appellees could be considered a proximate cause of Emily's death as a matter of law. As a result, we conclude that Johnson has failed to meet her burden of proof establishing that the trial court erred in granting the appellees' motions for summary judgment on this basis.

### B. "Misuse" of the Aircraft and Transportation Security Administration Guidelines

■ In the alternative, Beth argues that even if Eric's acts were intentional, the trial court improperly granted summary judgment in the appellees' favor because it should have been found that Eric's intentional misuse of the airplane was a foreseeable consequence of Grissom's non-existent security procedures. More particularly, Beth maintains that it was foreseeable that an unauthorized individual could have taken the airplane and flown off in it. Beth asserts that had proper security measures been in place at Grissom and had the airplane been secured, the tragedy could have been prevented.

■ In general, reasonably foreseeable intervening acts do not break the chain of causation, and the original wrongful act can still be deemed the proximate cause of the injury. *See Cook v. Ford Motor Co.,* 913 N.E.2d 311, 329–30 (Ind.Ct.App.2009) (observing that in a defective warning claim regarding airbags, it was appropriate to examine whether a child's negligent intervening act of unbuckling her seat belt

was foreseeable to the defendant manufacturer), *trans. denied; Conder v. Hull Lift Truck, Inc.,* 435 N.E.2d 10, 15–16 (Ind. 1982) (in a claim involving a defect design, it was proper to examine whether an intervening negligent alteration of a forklift's operating system constituted sufficient evidence of a superseding cause to preclude a liability finding against the manufacturer).

In support of her foreseeability claim, Beth relies on *Estate of Heck ex rel. Heck v. Stoffer,* 786 N.E.2d 265 (Ind.2003). In *Heck,* a police officer was murdered by the fugitive felon son of the defendant parents. The son used his parents' loaded firearm that he had taken without their permission or knowledge. *Id.* at 267. The decedent police officer's estate brought a negligence claim against the parents. Discovery revealed that the son, over a nine-year period, was charged or convicted of three instances of resisting law enforcement, two instances of battery, burglary, theft, drug possession, multiple counts of forgery and check deception, escape, non-support and contempt. Moreover, the son had stolen from his parents on numerous occasions, but they still permitted him to keep a key to their house.

Just before the shooting, the father told the police that he knew his son was consumed by a desperate frame of mind because the son knew that the police were looking for him, but the son did not want to be captured. Moreover, the father testified that his son had a "death wish." *Id.* at 269. Indeed, the parents had helped the son flee from law enforcement on several occasions. *Id.* at 267. Despite all of this, the parents stored their gun between the cushions of a chair in their bedroom, where their son could easily find it. *Id.* at 271.

The parents moved for summary judgment, based on: 1) lack of duty to the

deceased police officer; and 2) no proximate cause based on the superseding criminal act of their son. The trial court granted summary judgment and we affirmed that decision on the basis that the parents had no duty to the fallen police officer to safely store the handgun, and there was no proximate cause in light of the fact that the son's criminal actions were an intentional foreseeable intervening cause of the officer's death. *Estate of Heck v. Stoffer,* 752 N.E.2d 192, 199 (Ind.Ct.App.2001).

Our Supreme Court granted transfer and reversed on both grounds. First, it was determined that a gun owner does owe a duty of care to the public generally and under the facts at issue. Thus, a jury question existed as to whether or not the parents breached their duty of care through their method of storing the firearm. In particular, it was determined that the parents' knowledge of the facts including: 1) their son's criminal propensities; and 2) their knowledge of the foreseeable harm that their son posed to the police officers because of his desire to remain a fugitive, established a duty. *Id.* at 270.

Second, it was determined that because the officer's murder was a natural probable and foreseeable consequence of the defendants' act of leaving a loaded firearm in a location that was accessible to their son—a desperate fugitive from justice—the son's criminal act did not constitute a superseding cause. *Id.* at 271. Hence, genuine issues of material fact remained as to both duty and proximate cause. *Id.*

The "foreseeability" issue here, of course, concerns Emily's death. More specifically, the question is whether the appellees should have foreseen that Eric would permit Emily to board as his passenger when he knew that he was not yet authorized to carry a passenger, take off from the airport, and intentionally crash into his mother-in-law's residence.

As noted above, Eric was not some unknown, unauthorized person who gained access to the airplane in question on the date of the incident. To the contrary, Eric was known to those who were operating the airport, including Jacobs, the airport employee, who gave the airplane's keys to Eric on the date of the incident because he had a scheduled flying lesson on the airport calendar. Jacobs did not think that Eric was acting strangely when he saw him at the airport that day, and there was nothing out of the ordinary about a student pilot obtaining the keys to an airplane and taxiing it out to the runway before a scheduled flying lesson. Appellees' App. p. 37, 49–50. None of the employees saw Emily on the day of the flight and Eric gave no indication to anyone that he was taking a passenger with him. *Id.* at 58–59, 60–62.

In short, unlike the circumstances in *Heck,* nothing in the record suggests that the appellees should have foreseen that Eric would use the rented airplane to commit murder and suicide. Put another way, the designated evidence fails to establish that Eric's murder of Emily by intentionally crashing the airplane was a natural, probable, and foreseeable consequence of the appellees' purported violation of a duty to properly secure the airplane.

 Finally, we reject Beth's suggestion that a post–9/11 study that was conducted by the Transportation Security Administration (TSA) that she placed in the record are relevant to the issue of foreseeability and breach of the appellees' duty to provide security at the airport. More particularly, the publication that Beth submitted clearly states that the materials are only proposals, and those documents provide that it was simply recommending that TSA develop a plan for implementing a

risk management approach to general aviation security.

The security guidelines report states that

> This document does not contain regulatory language. It is not intended to suggest that any recommendations or guidelines contained herein might be considered as mandatory requirements imposed upon [General Aviation] facilities or operators, nor are these recommendations and guidelines intended to suggest any specific or general criteria to be met in order to qualify for Federal funding.

Appellant's App. p. 109. Moreover, it has been determined that "historically, [General Aviation] airports have *not* been subject to federal rules regarding airport security." Appellant's App. p. 112 (emphasis added).

As late as 2008, the TSA still did not require security programs at airports the size of Grissom, and the TSA was just beginning to engage in rulemaking regarding safety and security programs for aircraft operators that handle large aircraft. As a result, the trial court properly determined that the documents that Beth submitted did not establish a duty that Grissom and the appellees should have followed with regard to security at the airport.

For all these reasons, we conclude that the trial court properly granted summary judgment for the appellees.

The judgment of the trial court is affirmed.

KIRSCH, J., and BROWN, J., concur.