Terry SMITH, Appellant
(Plaintiff below),

v.

Ronald J. PANCNER, M.D., Richard F. Thompson, Jr., M.D., Pancner Psychiatric Services, Summit Psychiatric Services, P.C., and The Insurance Commissioner of the State of Indiana, Appellees (Defendants below).

No. 49S05–9610–CV–679.

Supreme Court of Indiana.

May 13, 1997.

Mark S. Pantello, Benson, Pantello, Morris & James, Fort Wayne, for Appellant.

Matthew W. Conner, Indiana Department of Insurance, Indianapolis, for Appellees.

## ON PETITION TO TRANSFER

BOEHM, Justice.

This case deals with the ability of a claimant who settles claims against multiple health care providers to access the Patient's Compensation Fund established by the Indiana Medical Malpractice Act. Plaintiff Terry Smith was treated by two psychiatrists, Dr. Ronald J. Pancner and Dr. Richard F. Thompson, Jr. Both doctors were qualified providers under the Medical Malpractice Act. IND.CODE §§ 27–12–1–1 to 27–12–18–2 (1993). A "qualified" provider is one who pays a surcharge and files proof of financial responsibility with the Insurance Commissioner. The liability of a qualified provider is limited to $100,000 per "occurrence." Section 14–3(b). However, a claimant whose damages from a single "injury or death" exceed that amount may petition the Patient's Compensation Fund for the excess up to $750,000 total recovery. Section 14–3(a).

Smith filed a proposed medical malpractice claim with the Indiana Department of Insurance against the two doctors and Pancner Psychiatric Services (PPS). PPS is described as a "d/b/a" or assumed business name used by the two at the time Smith's treatment started. In due course a medical review panel unanimously opined that the doctors were negligent in their treatment of Smith and that the negligence was a factor in Smith's damages. Smith then filed suit against the two doctors and PPS and shortly before trial settled his claim.

During the four month course of Smith's treatment the two doctors had incorporated their practices as Summit Psychiatric Services, P.C., with each owning 50% of Summit's stock.[1] Also, before the settlement, Dr. Thompson left the practice leaving Dr. Pancner as the sole shareholder and president of Summit. The settlement was the result of a negotiation initiated by a proposal by Summit's lawyer, who also represented the doctors and PPS. By letter to Smith's counsel ostensibly on behalf of Summit, which theretofore had no relation to the suit, he proposed that the three defendants would be dismissed and Summit would become a defendant and settle the claim. Ultimately a written agreement was entered into that recited that it was "by and among Smith, Sum-

---

1. It is not clear whether PPS had any assets or was a legal entity capable of being sued under Trial Rule 17(E). Nor is it clear whether it was contributed as a going business to Summit by the doctors who presumably owned it. Accordingly, it is unclear whether PPS had any liability apart from the doctors, and, if so, whether Summit assumed any liability PPS may have had. The parties make no contentions as to Summit based on PPS and we assume that Summit had no liability that derived from PPS as opposed to its potential exposure as the employer of the doctors after incorporation. As explained below, these points are irrelevant for purposes of this opinion.

mit and the Medical Protective Company." MPC had insured both doctors, PPS, and Summit against malpractice liability under four separate policies for the period in question. The doctors and PPS were not parties to the written settlement agreement. Summit and PPS were not qualified health providers. Only the two doctors were qualified.

■ Smith's settlement was indisputably sufficient to trigger access to the Fund if paid on behalf of a single qualified provider.[2] He filed his petition for payment from the Fund, naming as defendants the two doctors and PPS, and contending that his damages were at least $200,000.[3] The trial court entered summary judgment in favor of the Commissioner and the Fund, concluding that the settlement was by Summit, and not by any qualified health care provider. The Court of Appeals affirmed in a 2–1 decision. *Smith v. Pancner*, 663 N.E.2d 1162 (Ind.Ct. App.1996). We grant transfer and now reverse.

The majority in the Court of Appeals pointed to the fact that neither of the doctors was a party to the settlement agreement. It also noted that Summit and PPS, which are not "qualified" providers, were released by the settlement. The payment was stated to be on behalf of Summit, and only Summit was a party to the agreement.[4] The statute, Section 27–12–15–3, provides:

If a health care provider or its insurer has agreed to settle its liability on a claim by

payment of its policy limits of one hundred thousand dollars ($100,000), and the claimant is demanding an amount in excess of that amount, the following procedure must be followed [to pursue a claim against the Fund].

Judge Barteau, in dissent, concluded that the doctors had, in common sense terms, "agreed to settle" the claim against them, notwithstanding that the form of the transaction involved the substitution of Summit as a defendant along with the dismissal of claims against the doctors.

■ The proposal to substitute Summit was advanced by the doctors' attorney, who also represented Summit in the transaction. It purported to be made on behalf of Summit, but also required the dismissal of the claims against the doctors and effected a release of those claims as well.[5] The majority in the Court of Appeals concluded that the literal terms of the document controlled and ruled that the payment was on behalf of Summit, a nonqualified provider. However, we find no requirement that the parties cannot "agree to settle" orally or only partially in writing. It is obvious what the arrangement was. The written agreement called for payment by the insurer to release claims against all four.[6] The documentation supplied by Smith supports an inference sufficient to defeat summary judgment that (1) the arrangement met the requirement of Section 15–3 that a qualified provider (Dr. Pancner) or its insurer (MPC) "has agreed to

2. It consisted of a lump sum of $50,000 and an annuity costing more than $25,001. Under Indiana Code § 27–12–14–4(b), this was enough.

3. His medical expenses attributable to the allegedly negligent treatment were alleged to be in excess of $40,000.

4. The parties do not contend that the fact that the insurance company was a party to the settlement agreement satisfied the literal terms of the statute that a "health care provider *or its insurer* has agreed to settle" the liability of the health care provider. At first blush it would seem that that is exactly what happened here. The insurer agreed to settle the doctors' liability by payments that met the statutory requirements. The settlement agreement clearly calls for a release of the defendant, (now Summit by reason of the stipulated dismissal and substitution) "its employees, servants, agents, and representatives and insur-

er." Thus we have a document to which the insurance company is formally a party, apart from whether it might agree otherwise, that effects a release and termination of claims against *its insured (the doctors)* who are qualified health care providers and settles the case. However, the parties do not raise this contention, and we do not express a view as to it.

5. The agreement also included an express provision that the "release and discharge shall also apply to [Summit's] and [MPC's] ... officers, directors, stockholders...." Dr. Pancner was president and sole stockholder of Summit at the time.

6. The agreement contained an integration clause reciting that the document contained the entire agreement among Summit, Smith and MPC. It did not exclude additional provisions between Smith and Dr. Pancner.

settle" and (2) one of the "liabilities" settled was that of a Dr. Pancner, a qualified health care provider.

■ The Commissioner argues that allowing Smith's claim to proceed "threatens the solvency of the Patient's Compensation Fund" by exposing the Fund "to liability for which it has not received surcharge payments." The Commissioner does not explain, and the record does not reveal, whether the surcharge collected for a professional corporation and its professional employees is greater than the sum of the charges for the professionals if all are qualified providers. In any event, we agree that allowing claimants whose settlement agreements are with nonqualified health care providers access to the Fund is not authorized by the statute. But our holding today in no way suggests that result. Rather, we simply hold that there is a genuine issue of material fact as to whether either Dr. Pancner, a qualified health care provider, or his insurer were among those who agreed to settle Smith's claim in the requisite amount. As such, summary judgment in favor of the Commissioner on this issue was improper. Ind. Trial Rule 56(C). If the trial court finds that either Dr. Pancner or his insurer agreed to settle Smith's claim by payment of the required amount, Smith will be entitled to access to the Fund precisely because his agreement was with a qualified health care provider with respect to whom the Fund has received surcharge payments. As elaborated below, agreement with a qualified provider who is one of multiple jointly liable providers is sufficient to access the Fund. A contrary rule would simply encourage separate suits against multiple defendants.

■ This raises the next difficulty identified by the majority—whether the settlement payment was attributable in a sufficient amount to a qualified provider. The Court of Appeals noted that the settlement discharged claims against both qualified and nonqualified providers. The majority concluded that the Act required that the entire amount be attributable to a single qualified provider to gain access to the Fund. From this, the majority reasoned, it could not be said that the entire amount was attributable to one qualified provider's liability. The dissent correctly observes that the majority cited no authority for the proposition that the threshold amount must be attributable to a single provider, and we do not agree that it is correct. To the contrary, it is clear that the Act contemplates the prospect that more than one provider may be liable for the same occurrence and may contribute to a settlement that gives access to the Fund. For example, Indiana Code § 27–12–14–4 deals with the valuation of structured settlements for purposes of meeting the $100,000 threshold that is required for access to the Fund. Section 14–4(b) provides that if "periodic payments" (a defined term) are used, the "cost" (also defined) is used to value them and the sum of current payments plus the cost of future payments must exceed $75,000,[7] rather than the $100,000 required of a lump sum settlement. The statute goes on to provide in Section 14–4(c) that:

> More than one (1) health care provider may contribute to the cost of a periodic payments agreement, and in such an instance the sum of the amounts expended by each health care provider for immediate payments and for the cost of the periodic payments agreement shall be used to determine whether the seventy-five thousand dollar ($75,000) requirement in subsection (b) has been satisfied. However, one (1) health care provider or its insurer must be liable for at least fifty thousand dollars ($50,000).

Under this provision, to recover from the Fund, the claimant must establish that a single provider "must be liable" for at least $50,000.[8] The record before us on this ap-

---

7. This provision, introduced in 1985, has been interpreted to mean that aggregate contribution of two or more providers exceeding $75,000 establishes both (1) the necessary amount, and (2) that the carriers involved have paid their policy limits. *See, e.g.,* Robin B. Stickney, *1985 Amendments to the Indiana Medical Malpractice Act,* 19 IND. L.REV. 403, 407 (1986). The first seems

obvious from the face of the statute. The second is not before us and we express no opinion as to it.

8. The statute does not explicitly state how periodic payments are valued for purposes of the $50,000 test, but for purposes of this appeal it is sufficient that the settlement in question involved

peal from a grant of summary judgment does not permit us to determine whose "liability," within the meaning of this provision, exceeded $50,000. However, it appears that the plaintiff is asserting a joint liability. It also appears unlikely that the two doctors had several liability for plaintiff's injury if they are liable at all. If their liability was joint, payment on behalf of either would extinguish the liability of both, and should be treated as made in the full amount on behalf of each. Thus, if Smith had sued only the two doctors on a joint liability, and settled with them, there would be access to the Fund because "at least" $50,000 of the settlement was attributable to each of the two doctors. The same would be true if one of the two is liable for the full amount and the other jointly liable for a lesser amount. However, there remains the possibility that the two are severally liable, each for an amount that does not access the Fund. In that event, Smith cannot aggregate his injuries to access the Fund when neither separately would accomplish that. Accordingly, we reverse grant of summary judgment for the Fund, but do not direct judgment for Smith on his cross motion.

Assuming at least one of the doctors is liable for the requisite amount, we believe treating a payment on behalf of jointly liable providers as attributable to each is sensible. It is not uncommon for professionals to have a common carrier insuring multiple professionals. The Medical Malpractice Act explicitly contemplated access to the Fund by a person injured in an amount in excess of $100,000 by the joint actions of multiple actors, even with different insurers. The logic

of the Court of Appeals majority would preclude recovery from the Fund in this case even if only the two doctors, both qualified providers, were defendants at all times and both were jointly liable for all damages. Yet the Fund could be accessed if only one were sued for the same injury. We find nothing that would suggest that a claimant injured by one qualified professional can recover, but one injured by two or more cannot. Nor does there appear to be any reason why such a result would be contemplated by the Legislature.

There remains the possibility of a settlement for both qualified and unqualified providers that does not meet the required amount because of the portion allocable to the nonqualified provider. That is not the case here, however. To the extent Summit or PPS had liability, as far as this record reveals, that liability could only be by reason of Pancner's and/or Thompson's liability under doctrines of respondeat superior. Thus, the liability of the nonqualified entities could not exceed that of the two doctors, even if it may duplicate one or both of the doctors' exposure. As a result, on these facts, the liability of one or both of the doctors, in an amount "at least" $50,000 was established by this settlement if the liability was joint.

The Commissioner argues that the effect of permitting Smith to recover under these circumstances is to permit Summit to benefit from the Act's limitations on liability free of charge and to expose the Fund to liability for which it has not received any payment. However, if Summit was not a qualified provider, but was exposed to liability to Smith,[9]

a $50,000 immediate payment from a single insurer to extinguish what appeared to be joint liability. This provision has been interpreted as requiring at least one insurer to pay $50,000 at time of settlement. Eleanor D. Kinney et al., *Indiana's Medical Malpractice Act: Results of a Three-Year Study*, 24 IND. L. REV. 1276, 1280 (1991). That issue is also not raised by this appeal. A further issue may also affect access to the Fund. The record before us does not make clear whether the limits of the two policies insuring the doctors may be aggregated. The parties have not argued and we express no opinion whether that would make any difference under Section 15–3 quoted above. Nor must we decide whether the $50,000 that a provider is "liable for" under the section is measured by the

amounts paid on behalf of the providers under the settlement or by the exposure of the providers, presumably capped by Indiana Code § 27–12–14–3(b) at $100,000, notwithstanding that participation by multiple providers may reduce the contribution of each below that amount.

9. The statute of limitations had apparently run before Summit volunteered to become a defendant. Smith argues that this means that there was no consideration for Summit's assuming liability and, indeed that Summit had no liability. The Commissioner argues that Summit might have been added as a defendant with the amendment to the complaint relating back under Trial Rule 15, if plaintiff had elected to sue it. This is

then Smith could have elected to sue Summit and seek recovery in excess of the statutory caps. IND.CODE § 27–12–3–1 (1993). Because the liability of the doctors, who paid the surcharge, is sufficient to grant access to the Fund, and Summit's exposure, if any, merely duplicates the doctors', there is no windfall.

Finally, the Court of Appeals observed that Smith conceded at oral argument in that court that he was aware that the arrangement created an issue as to access to the Fund. The flip side of this is that the agreement did not prohibit Smith from seeking further compensation. The parties simply agreed to leave this issue for resolution by the courts. We regard this as a legal stand-off favoring neither side.

The trial court's entry of summary judgment for the Commissioner and the Fund is reversed. This case is remanded for further proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, SULLIVAN and SELBY, JJ., concur.

true after the statute had run only if Summit "knew of or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against him." T.R. 15(c)(2). It appears debatable whether Summit could have been exposed to liability under these circumstances, but for the reasons set forth in this opinion we need not deal with that issue.