In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-1437

JEFFREY B. CUTCHIN, as Personal Representative
of the ESTATES OF CLAUDINE D. CUTCHIN and
ADELAIDE E. CUTCHIN,

*Plaintiff-Appellant,*

*v.*

STEPHEN W. ROBERTSON, Commissioner of the
Indiana Department of Insurance,
Administrator of the Indiana Patient's
Compensation Fund,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:18-cv-00028-TWP-MPB — **Tanya Walton Pratt**, *Judge.*

ARGUED SEPTEMBER 22, 2020 — DECIDED FEBRUARY 3, 2021

Before SYKES, *Chief Judge,* and FLAUM and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Jeffrey Cutchin's wife and daughter were killed in an automobile accident that occurred when

another driver, Sylvia Watson, ran a red light and struck their vehicle. Cutchin, as the representative of their estates, alleges that Watson's driving ability was impaired as the result of medications she had been prescribed, among them an opioid. Cutchin filed a malpractice suit against Watson's healthcare providers, charging them with negligence for, among other omissions, an alleged failure to warn Watson that she should not be driving given the known motor and cognitive affects of the medications she was taking. After the providers and their malpractice insurer agreed to a settlement of $250,000, the maximum amount for which they can be held individually liable under the Indiana Medical Malpractice Act (the "MMA" or "Act"), Cutchin sought further relief from the Indiana Patient's Compensation Fund (the "Fund"), which acts as an excess insurer. The Fund argued that the MMA does not apply to Cutchin's claim and that he is barred from seeking excess damages from the Fund. The district court agreed, resulting in this appeal.

Because existing Indiana case law does not supply sufficient guidance on two questions that are crucial to the resolution of this appeal, we certify these questions to the Indiana Supreme Court, pursuant to Circuit Rule 52 and Indiana Appellate Rule 64.

## I.

Late in the afternoon of February 2, 2017, Watson, age 72, picked up her car from an automotive repair shop in Owensville, Indiana and drove toward Princeton, Indiana. Her 27-year-old granddaughter, Brandy Mayer, was riding with her as a passenger in the car. Before the two left the repair shop, Mayer had seen her grandmother take two pills from a prescription bottle and swallow them. As Watson's car

approached a controlled intersection where the traffic light was red, Watson was unable to move her foot from the accelerator to the brake and exclaimed to Mayer, "I can't stop." As a result, her car crashed into the vehicle driven by Claudine Cutchin, 56 (Jeffrey's wife), with her daughter Adélaide, 22, in the passenger seat. Claudine was pronounced dead at the scene of the accident, and Adélaide died a short time later at a local hospital. Watson herself suffered severe injuries and died two and a half weeks later. Mayer escaped serious injury.

A blood test performed after the crash revealed the presence of opiates in Watson's system. Watson had been under the care of Anonymous Healthcare Provider 1 (the "Physician") at Anonymous Healthcare Provider 2 (the "Clinic") since May 2000. The Physician had prescribed some eight different medications to Watson, including an opioid and muscle relaxers.

In January 2018, following the procedural requirements of the MMA, Cutchin filed a proposed complaint with the Indiana Department of Insurance against the Physician and the Clinic seeking the recovery of damages resulting from medical malpractice. At the same time, as Indiana law permits, he filed his malpractice claim in the district court, invoking its diversity jurisdiction: Cutchin is a citizen of Illinois (as were the decedents), whereas the Physician and Clinic are citizens of Indiana. The complaints alleged that the Physician breached the standard of care he owed to Watson by, *inter alia*, failing to warn her about the dangers of operating a motor vehicle while under the influence of the medications she had been prescribed, failing to screen her for cognitive impairment caused by these medications, failing to adjust her medications to address problems with muscle control, and failing

to ask the Indiana Bureau of Motor Vehicles to conduct an assessment of Watson's driving ability. Cutchin further alleged that the Physician's negligence in providing health care to Watson caused the wrongful deaths of his wife Claudine and daughter Adélaide. Cutchin subsequently amended his complaint to request a declaratory judgment concerning the applicability of the MMA to his claim.

As applicable here, the MMA caps the amount of recoverable damages for malpractice at $1.25 million.[1] A physician is responsible for procuring malpractice insurance coverage up to $250,000, which is the maximum amount for which he or she can be held personally liable as a "qualified provider" under the Act. Physicians also pay a surcharge to help fund the Patient's Compensation Fund (the "Fund"), which acts as an excess insurer and will pay up to $1 million in damages above the physician's $250,000 exposure.

With the district court's permission, the Fund's administrator, Stephen W. Robertson, intervened in the litigation below in order to protect the Fund's interest. The Fund took the position that the Act did not apply to Cutchin's claim and the Fund should not be liable for any excess damages.

In March 2019, the district court convened a settlement conference at which the Fund was represented. The Physician reached a settlement with Cutchin and agreed to pay the maximum of $250,000. All parties, including the Fund, executed a memorandum of agreement which acknowledged the settlement, called for termination of the medical review panel

---

[1] These are the caps that were in place when the acts of malpractice alleged in this case took place. They have since been increased.

proceedings as to the Physician and Clinic that were triggered by the complaint Cutchin had filed with the Department of Insurance, and noted that Cutchin was reserving his right to pursue excess damages from the Fund. The Physician and the Clinic were dismissed from the litigation and released from any further liability. Cutchin then filed a petition for payment of excess damages from the Fund. The Fund took the position that it had no liability because the underlying acts, in its view, were not within the purview of the MMA.

The parties filed cross-motions for summary judgment on Cutchin's request for declaratory relief, and the district court entered summary judgment in favor of the Fund. The court in the first instance rejected Cutchin's argument that, by the express terms of the Act, the settlement with the Physician was conclusive of liability under the MMA and precluded the Fund from contesting the applicability of the Act. The court went on to find that neither Cutchin, Claudine, nor Adélaide constituted "patients" of the Physician and the Clinic within the meaning of the MMA, and consequently Cutchin's claims did not fall within the scope of the Act. Cutchin was therefore barred from seeking excess damages from the Fund. *Cutchin v. Ind. Dep't of Ins.*, 446 F. Supp. 3d 413 (S.D. Ind. 2020).

## II.

Cutchin has presented two questions for review: (1) Whether Indiana's Medical Malpractice Act prohibits the Patient's Compensation Fund from contesting the Act's applicability to a claim after the claimant concludes a court-approved settlement with a qualified health care provider, and (2) whether Indiana's Medical Malpractice Act applies to claims brought against individuals who did not receive medical care from the provider, but who are injured as a result of

the provider's negligence in providing medical treatment to someone else. Cutchin at the outset asks that we certify these questions to the Indiana Supreme Court pursuant to Seventh Circuit Rule 52(a) and Indiana Rule of Appellate Procedure 64. For the reasons that follow, we agree that certification is appropriate: The questions presented are ones of state law, are important, are dispositive of this case, and are likely to recur, and yet the existing Indiana case law sends conflicting signals as to the appropriate answers.

The MMA was enacted in 1975 in response to a malpractice insurance crisis in Indiana: malpractice claims were increasing in number and resulting in higher damage awards; insurers were withdrawing from the Indiana market; premiums were soaring; physicians were having difficulty obtaining coverage, particularly in high-risk specialties like anesthesiology; and rural areas of the state were losing physicians. The Indiana General Assembly adopted a comprehensive scheme to address the crisis that features caps on malpractice damages, voluntary participation in a state-sponsored excess insurance fund, a partially streamlined adjudicative process, and enhanced oversight of healthcare providers via medical review panels. A provider wishing to invoke the protections of the MMA obtains malpractice liability coverage in an amount equivalent to the applicable limit on the provider's liability—in this case, $250,000—files proof of financial responsibility with the commissioner of the Indiana Department of Insurance, and pays a surcharge to the Fund for excess coverage. The Fund then acts as a provider's excess insurer. The Fund's own liability is likewise capped, in this case at $1 million. Once a malpractice claim against a provider is resolved at the limits of the provider's liability, the Fund's coverage is triggered, and liability is considered established; the only

issue for resolution at that juncture is the amount of excess damages to which the claimant is entitled.

Having settled with the Physician for the maximum amount of the Physician's exposure—$250,000—Cutchin is seeking additional damages from the Fund up to the maximum of its exposure—$1 million. But the Fund asserts that Cutchin's claim falls outside the scope of the MMA and that it consequently has no liability to Cutchin.

Neither Cutchin nor his decedents were in the medical care of the Physician with whom he settled—Watson was the doctor's "patient" in the sense that we ordinarily understand that term. But the term "patient" is also a term used in the MMA to determine, among other things, who may pursue a medical malpractice claim under the Act. Cutchin's claim is premised on the notion that Watson's doctor was negligent in treating her, and as a result of that negligence, his wife and daughter were foreseeably injured. He asserts that his claim therefore is one for medical malpractice, and one for which he may seek recompense according to the terms of the MMA, including its broad definition of "patient." The Fund takes the position that because neither Claudine nor Adélaide qualifies as a "patient" of the Physician under the terms of the Act, Cutchin's claim is not one for malpractice and therefore is not one governed by the Act, with the result that the Fund can have no liability to Cutchin. Of course, the claim against the Physician presumably was settled on the understanding that Cutchin's claim *is* one for malpractice. Which brings us to the first of the two questions presented.

Where, as in this case, a health care provider or its insurer has agreed to settle the provider's liability on a malpractice claim by paying the policy limits ($250,000), and the claimant

is demanding an amount in excess of those limits, a claimant must file a petition in court seeking an excess payment from the Fund. The Act specifies that in resolving what damages, if any, should be paid by the Fund, "the court shall consider the liability of the health care provider as admitted and established." Ind. Code § 34-18-15-3(5). Cutchin understands this language to mean that his settlement with the Physician precludes the Fund from contesting whether the underlying claim is one for malpractice that is covered by the Act and on which the Fund can be liable. In his view, the only task for the court to resolve is what excess damages he is owed for the death of his wife and daughter.

The Fund's contrary position, that it is free to contest the applicability of the Act and its own liability notwithstanding the settlement with the Physician, finds support in cases which have addressed certain categories of coverage questions after settlements with healthcare providers. We discuss these cases below. More broadly, the Fund's position is consistent with Indiana cases treating questions as to whether a claimant has alleged a claim of medical malpractice as ones implicating the subject matter jurisdiction of the court. *See Madison Ctr., Inc. v. R.R.K.*, 853 N.E.2d 1286, 1288 (Ind. Ct. App. 2006); *Weldon v. Universal Reagents, Inc.*, 714 N.E.2d 1104, 1106, 1107–08 (Ind. Ct. App. 1999); *Putnam Cnty. Hosp. v. Sells*, 619 N.E.2d 968, 970 (Ind. Ct. App. 1993).

Because the Act establishes a compensation scheme for claims of medical malpractice against qualified providers of medical care, courts have entertained threshold questions as to whether particular claims against the Fund arise from the provision of medical care by qualified providers despite prior settlements with the providers in question.

For example, in *Wisniewski v. Bennett*, 716 N.E.2d 892 (Ind. 1999), the Indiana Supreme Court concluded that a claimant could not seek recovery from the Fund because the physician and medical group charged with malpractice (and with whom the claimant had already settled) were not qualified providers under the Act. As the court emphasized at the outset of its analysis:

> The Act is explicit that "[a] health care provider who fails to qualify under this article is not covered by this article and is subject to liability under the law without regard to this article. If a health care provider does not qualify, the patient's remedy is not affected by this article." Ind. Code § 34-18-3-1 (1998). In addition, "[o]nly while malpractice liability insurance remains in force are the health care provider and the health care provider's insurer liable to a patient or the patient's representative for malpractice to the extent and in the manner specified in this article." *Id.* § 34-18-13-1.

*Id.* at 894. The providers in question had obtained medical malpractice coverage as required by the Act, but from an Illinois insurer that was not licensed to issue such policies in Indiana. Moreover, the insurer had failed to pay the requisite surcharge to the Fund on behalf of the physician and medical group. Consequently, the medical care that the physician and medical group had provided fell outside the coverage of the Act and, despite their settlement with the plaintiff, the Fund bore no liability to the plaintiff.

> [T]he purposes of both the Act and the Fund would be frustrated by the result Wisniewski

seeks. To preserve an acceptable standard of health care and an adequate number of providers in Indiana, the General Assembly established a state sponsored liability insurance program. *See Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 379–80, 404 N.E.2d 585, 589–90 (1980). If healthcare providers comply with the requirements of the Act, including paying the yearly surcharge, the Act caps liability for these providers who pay the first $100,000 on a claim [the applicable limit at that time]. If providers and insurers who have not paid the yearly surcharge that maintains the Fund are permitted to avoid liability by paying the first $100,000 on a claim from some other source, including personal funds, and shift the remaining liability to the Fund, the financial viability of the Fund is undermined. In addition, it would be fundamentally unfair to other providers and insurers to permit Chand and ISIMIE [the physician and insurer], who did not pay into the Fund, and Southeastern [the medical group], who paid into the Fund for a fraction of the exposure period, to shift their financial liability to the Fund. The Fund was not designed to be, in effect, a free excess carrier for insurance companies who have received premiums and accepted the risk of malpractice by their insured. Rather only those who contribute to the Fund are intended to get its benefits.

*Id.* at 897. *See also Smith v. Pancner*, 679 N.E.2d 893, 896 (Ind. 1997).

Likewise, despite claimants' prior settlements with their providers, Indiana courts have readily reached questions as to whether particular claims against the Fund sound in malpractice, as is it only such claims that the Act covers. Thus, in *Murphy v. Mortell*, 684 N.E.2d 1185 (Ind. Ct. App. 1997), the court held that a claimant, who while hospitalized had been sexually molested by a hospital technician, could not seek compensation from the Fund.

> The Medical Malpractice Act does not specifically exclude intentional torts from the definition of malpractice; however, the Act pertains to curative or salutary conduct of a health care provider acting within his or her professional capacity, and is designed to exclude that conduct unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment.

*Id.* at 1188 (cleaned up). The claimant's injuries in *Murphy* did not arise from the provision of healthcare: although her injuries occurred at the hospital, the perpetrator's wrongful acts were not aimed at promoting the claimant's health nor did they call for the exercise of the perpetrator's skill and expertise as a health care provider. *Id.* By contrast, in *Dillon v. Callaway*, 609 N.E.2d 424 (Ind. Ct. App. 1993), the court concluded that a claimant whose physician had engaged in a sexual relationship with her over the course of psychotherapy for sexual abuse, was permitted to seek damages from the Fund. The court's majority agreed with the Fund in the first instance that it could address this issue notwithstanding the physician's settlement with the claimant:

> [T]he Fund's argument here, that Callaway's sexual relationship with Dr. Chambers did not fall within the scope of the Act, relates to the question of whether Callaway's injuries are compensable under the Act. Therefore, ... the compensable nature of Callaway's injuries was not decided by her settlement with Dr. Chambers and his insurer, and is properly before us.

*Id.* at 426. Relying on a recognized phenomenon of transference, in which the patient is encouraged to imagine her therapist as the abuser, the majority went on to find that the physician's abuse did arise from an effort to provide healthcare to the patient, in the course of which the provider was called on to exercise his professional skill and judgment—however badly he mishandled the therapy. The patient's claim thus did qualify as one for malpractice, and she had the ability to seek excess damages from the Fund. *Id.* at 427–28. The third member of the panel concurred in the result, reasoning that the Fund's arguments opposing the plaintiff's right to recover concerned questions of proximate cause and liability rather than whether her injuries were compensable under the MMA. The concurrence deemed the settlement with the physician and his insurer preclusive of such arguments. *Id.* at 428–29.

The Act assigns courts the role of determining appropriate damages when claims are asserted against the Fund. Thus, courts have also entertained questions as to whether the types of injuries for which claimants have sought relief from the Fund are, in fact, compensable under the Act.

In *Rimert v. Mortell*, 680 N.E.2d 867 (Ind. Ct. App. 1997), for example, the court held that a patient's loss of enjoyment of life stemming from his imprisonment was not the sort of

injury that was compensable under the Act and the Fund was therefore not subject to a claim for excess damages for such an injury. The patient in *Rimert* was mentally ill and had been hospitalized for his illness for several weeks until his physician discharged him. He soon thereafter murdered four people. He was charged with the murders and found guilty but mentally ill and was incarcerated for life. His mother, as his representative, pursued a claim of malpractice against the physician, characterizing as negligent his decision to release her son from the hospital. She settled with the physician and then sought excess damages from the Fund, contending that the physician's malpractice had deprived her son of the enjoyment of his life, given his incarceration. Although the claim was one for medical malpractice, the asserted injury, in the court's view, was not one that was compensable under the Act. By way of explanation, the court noted preliminarily that the settlement with the physician did not preclude the court from considering whether the excess damages sought from the Fund were of the sort for which the law permitted compensation. "Since the [Fund] is not required to pay legally non-compensable damages, we have determined that a settlement of liability [as to the physician] does not render the requested damages [from the Fund] legally compensable." *Id.* at 871 (citing *Callaway*). Surveying the case law from other jurisdictions, the court then went on to conclude that public policy proscribed compensation for injuries resulting in part from an illegal act for which the patient himself was culpable. *Id.* at 871–76. As a matter of state law, the jury's finding that the patient was guilty but mentally ill ascribed the same degree of culpability to the patient as an unqualified verdict of guilty. *Id.* at 875. Consequently, the patient was criminally responsible for the murders, and this barred his mother's claim for

damages: "The petition for excess damages from the [Fund] is predicated upon a criminal act for which Gary [the son/patient] has been found fully responsible and is therefore barred as a matter of public policy." *Id.* at 876. *See also J.L. v. Mortell*, 633 N.E.2d 300, 303–04 (Ind. Ct. App. 1994) (settlement with provider did not preclude inquiry into compensable nature of claimant's damages); *Robertson v. B.O.*, 977 N.E.2d 341, 347 (Ind. 2012) (acknowledging that settlement with provider did not preclude Fund from contesting compensability of claim).

At the same time, the *Rimert* court held that it was without the authority to reach a separate question that the Fund had presented as to whether the physician's malpractice was the proximate cause of the patient's injury. "[T]he question of proximate causation is a component of the greater concept of liability and ... therefore, if liability has been established, the issue of proximate causation has necessarily been decided." *Id.* at 871 (citing *Dillon v. Glover*, 597 N.E.2d 971, 973 (Ind. App. Ct. 1992)). By the terms of the MMA, the mother's settlement with the physician for the limit of his individual responsibility had resolved the matter of liability; consequently, the Fund was barred from disputing proximate cause. *Id.* at 871. The court was sympathetic to the Fund's concern that a settlement between a claimant and a provider might be motivated by something other than merits of the malpractice claim, and that physicians and their insurers ought not be able to unilaterally bind the Fund on liability questions by agreeing to settle. *Id.* at 871. But, in the court's view, such arguments were better directed to the Indiana legislature. *Id.*

In the same vein, *Glover*, which *Rimert* followed, held that questions concerning proximate cause were off limits once the Fund's liability was triggered by resolution of the claim

against the physician. The claimant in *Glover* alleged that a physician's nine-month delay in diagnosing her husband's lung cancer had resulted in his death. The claimant settled with physician and insurer for the provider-maximum and then sought excess damages from the Fund. After a trial, the lower court awarded her $400,000. The Fund contended on appeal that it had no liability to the claimant because the alleged malpractice was not the proximate cause of her husband's death. In the Fund's view, the physician's negligence had deprived the patient of merely modestly-improved odds of survival; the real cause of his death was cancer. But the appellate court abstained from that question, reasoning that, by the express terms of the MMA, the Fund's liability was established by the settlement with the physician; the matter of proximate cause could therefore not be litigated by the Fund.

> This statute is unambiguous, in fact it could be characterized as a paragon of clarity. In determining the amount to be paid from the Fund "the court shall consider the liability of the health care provider as admitted and established" if it has agreed to settle its liability—as happened here.

> The Fund would equate settlement with an admission of negligence, and claims that the issue of whether the health care provider's negligence proximately caused any damage is properly considered by the trial court. The Statute, however, speaks of settling a health care provider's *liability* and provides that the trial court will consider the *liability* of the health care provider as admitted and established.

> Our Supreme Court has observed: "It is axio-
> matic that, before *liability* can be imposed, there
> must be proof that the defendant's negligence
> *proximately caused* the plaintiff's harm." *Dunn v.
> Cadiente* (1987), Ind., 516 N.E.2d 52, 55 (empha-
> sis supplied). It therefore follows that once *lia-
> bility* is established, the issue of proximate cause
> is decided.

*Id.* at 973 (emphasis in *Glover*). *See also Atterholt v. Herbst*, 902
N.E.2d 220, 223–24 (Ind. 2009) (agreeing with *Glover* that set-
tlement with provider precluded consideration of causation,
but holding that evidence regarding patient's slim chance of
survival even with timely diagnosis was separately admissi-
ble as to measure of damages); *Robertson v. B.O.*, *supra*, 977
N.E.2d at 345 (maximum settlement with provider establishes
liability, and by implication, the required elements of causa-
tion and injury); *Atterholt v. Robinson*, 872 N.E.2d 633, 643 (Ind.
Ct. App. 2007) (although maximum settlement with provider
precludes Fund from disputing causation, it does not pre-
clude Fund from contesting statutory theory of recovery).

One can make competing arguments as to whether the de-
fenses that the Fund asserts to Cutchin's claim fall within the
limited category of issues that may be contested after a settle-
ment with the provider at the provider's maximum exposure.
It is easy to appreciate that the Fund is raising a threshold
question concerning the applicability of the MMA. As the
Fund sees it, because Claudine and Adélaide were never
treated by the Physician, Cutchin is not a "patient" who may
assert a claim within the MMA framework. This question is
comparable to the threshold contention raised in *Wisniewski*
that the physician and hospital there were not "qualified

providers" under the Act. And yet there is no real doubt that Cutchin's claim is one founded in malpractice allegedly committed by the Physician (a qualified provider): the Physician was providing medical care to Watson, Cutchin's claim arises from that care and challenges the propriety of the Physician's acts and omissions in providing that care, and in order to assess whether the Physician breached his professional obligations to Watson, a factfinder would necessarily have to reference the medical standard of care prevailing in the local community. *See Terry v. Cmty. Health Network, Inc.*, 17 N.E.3d 389, 394 (Ind. Ct. App. 2014). At the same time, as we discuss below, there are Indiana cases recognizing that a physician does have a duty to warn and monitor his patient as to the side effects of prescribed medications that may foreseeably endanger not only the patient, but third parties. It is this particular duty that Cutchin alleges Watson's physician breached. Arguments as to whether it was foreseeable that a breach of this duty might result in harm to Claudine and Adélaide could be understood as contentions focused on whether the Physician's alleged malpractice proximately caused the deaths of Claudine and Adélaide, given that the foreseeability of injury is one aspect of the probable cause determination. *See Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 389 (Ind. 2016) (citing *Control Techs., Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002)) (recognizing that for most negligence actions, proximate cause is primarily a question of foreseeability); *Johnson v. Jacobs*, 970 N.E.2d 666, 671 (Ind. Ct. App. 2011) ("To be considered a proximate cause, the negligent act must have set in motion a chain of circumstances which, in the natural, probable and continuous sequence, led to the resulting injury. And foreseeability of injury is regarded as an essential element or fundamental test of proximate cause.") (citations omitted).

Seen in this way, the arguments that the Fund raises could be deemed to implicate subsidiary aspects of liability that the MMA deems resolved once a claimant has settled with a provider for the limit of the provider's liability, as in *Rimert* and *Glover*.

Which brings us to the second issue that the parties have raised in this case. The MMA by its terms regulates claims arising from the injury or death of a "patient." *See* Ind. Code § 34-18-14-3(a) (setting forth caps on recovery). And the Act authorizes a complaint to be filed solely by "a patient or the representative of a patient who has a claim under the article for bodily injury or death on account of malpractice." Ind. Code § 34-18-8-1. The Act defines the term "patient" as:

> an individual who receives or should have received health care from a health care provider, under a contract, express or implied, *and includes a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider.* Derivative claims include the claim of a parent or parents, guardian, trustee, child, relative, attorney, or any other representative of the patient including claims for loss of services, loss of consortium, expenses, and other similar claims.

Ind. Code § 34-18-2-22 (emphasis supplied).

As we have noted, the person who received healthcare from the Physician in this case was Watson. Cutchin is not pursuing that claim as Watson's representative, but rather as the representative of his deceased wife and daughter, neither of whom was in the medical care of the Physician or the

Clinic; they were strangers to the relevant relationship between Watson and her doctor. *Cf. Madison Ctr., Inc. v. R.R.K.,* *supra*, 853 N.E.2d at 1288 (emphasizing that medical malpractice is the breach of duty owed by health care provider to patient); *Giles v. Anonymous Phys. 1*, 13 N.E.3d 504, 511 (Ind. Ct. App. 2014) ("[A] physician who does not treat a patient or perform some affirmative act regarding the patient has no physician-patient relationship and thus owes no duty to that patient."). But Cutchin responds that he is "a person having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider." Cutchin's claim *is* premised on the allegation that the Physician committed malpractice in the course of treating Watson; he simply asserts that the malpractice injured not only Watson herself, but Claudine and Adélaide. That third parties might be injured by the Physician's failure to monitor and warn Watson regarding the effects of opiates and other medications prescribed to her, Cutchin argues, was as foreseeable as the possibility that Watson herself might be injured; therefore, he has the right to pursue relief under the MMA. Cutchin adds that the purpose of the MMA is to limit liability of healthcare providers; pursuing his claim within the framework of the MMA and its limits on patient recovery is consistent with that purpose. In Cutchin's view, it would be ironic if the result of this case would be to limit the recovery of one who was actually treated by a provider (like Watson) while allowing *un*limited recovery by third parties injured as a result of the same treatment (like Caudine and Adélaide).

Whether a party in Cutchin's position has the authority to assert a claim pursuant to the MMA implicates two related questions: first, whether a physician's duty of care to his patient extends to third parties who might, like the patient

herself, be injured as a result of a breach of that duty, and if so, then second, whether such a third party (or her representative) can be considered to be a "patient" as the MMA broadly defines that term with the authority to seek relief (including excess damages from the Fund) under the Act. There are Indiana cases addressing both questions but, once again, they do not supply a clear answer as to whether Cutchin may pursue relief under the MMA.

We begin by noting that the Indiana Supreme Court has allowed a party other than the person treated by a healthcare provider (or her representative) to assert a claim for medical negligence against the provider. These cases recognize that a physician may owe a duty of care to an unknown third party foreseeably injured as a result of the physician's treatment of a person in his care.

In *Cram v. Howell*, 680 N.E.2d 1096 (Ind. 1997), the court reversed the dismissal of a malpractice claim filed against a physician by the estate of a man who was struck and killed in traffic when the physician's patient passed out while driving, shortly after he received a vaccination in the physician's office. The patient had a history of losing consciousness in the immediate aftermath of vaccinations, and the estate argued that the physician, despite his awareness of this history, failed to monitor the patient for a sufficient period of time following the vaccination and failed to warn the patient about the potential hazards of driving after receiving a vaccination. Looking to its prior decision in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), the court weighed three factors in assessing whether the physician owed a duty to a third party injured by his patient: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the injured person, and (3) public

policy concerns. 680 N.E.2d at 1097. Although there was no relationship between the physician and the non-patient who was injured, the court concluded that the other two factors weighed in favor of recognizing a duty to the non-patient. One could infer from the estate's allegations that the doctor had actual knowledge of his patient's propensity to lose consciousness following a vaccination. "It was therefore reasonably foreseeable that the patient, if permitted to drive in this condition, would injure third persons." *Id.* at 1098. Public policy considerations likewise supported recognizing a duty to such third persons. The estate's claim did not suggest that the physician should have refrained from giving his patient appropriate medical care, including vaccinations, but rather that the physician should have watched his patient for an appropriate time before allowing him to leave the office and should have admonished his patient about the dangers associated with operating a motor vehicle while he was at risk of losing consciousness. Imposing such a duty for the benefit of third parties thus was not inconsistent with the physician's professional obligations to his own patient. *Id.* "Balancing the three *Webb* factors, we find that the defendant physician here owed a duty of care to take reasonable precautions in monitoring, releasing, and warning his patient for the protection of unknown third persons potentially jeopardized by the patient's driving upon leaving the physician's office." *Id.*

Consistent with its decision in *Cram*, the Indiana Supreme Court, on facts even closer to those presented here, implicitly sustained the viability of a malpractice claim asserted by a third party injured as a result of a physician's breach of duty to his patient. *Manley v. Sherer*, 992 N.E.2d 670 (Ind. 2013). The plaintiff in *Manley* was injured in a head-on collision with a patient who lost consciousness while driving due to a medical

condition and medications prescribed by the patient's physi-
cian. The plaintiff suffered permanent, debilitating injuries as
a result of the collision. After settling a suit against the patient,
the plaintiff and her husband (who claimed loss of consor-
tium) filed suit against the physician pursuant to the MMA,
alleging that the physician had committed malpractice in fail-
ing to warn his patient not to drive. The physician sought to
dismiss the suit, arguing *inter alia* that the malpractice claim
was without merit.

The trial court granted the motion to dismiss, but the ap-
pellate court disagreed and deemed the claim viable. *Manley
v. Sherer*, 960 N.E.2d 815 (Ind. Ct. App. 2011), *opinion vacated
upon transfer*, 967 N.E.2d 1034 (Ind. 2012); Ind. R. App. P.
58(A). Although the plaintiff and her husband had no rela-
tionship with the physician, it would have been reasonably
foreseeable to the physician that his patient was at risk of los-
ing consciousness while driving, in view of her medical con-
ditions and medications, and to that extent posed a danger to
third parties. The physician thus bore a duty to warn his pa-
tient not to drive—a duty that extended not only to his patient
but to third parties whom his patient might foreseeably injure
if she drove. *Id.* at 822–23. Imposing such a duty, in the court's
view, would not impinge on the doctor-patient relationship;
on the contrary, such a duty would benefit the patient herself
as well as third parties like the plaintiff. *Id.* The court went on
to find that there were disputes of fact as to whether the phy-
sician's failure to adequately warn his patient about the dan-
gers of driving proximately caused the injury to the plaintiff:
the doctor had warned her on at least one occasion, and the
patient had acknowledged to police in the immediate after-
math of the accident that she should not have been driving,
and yet she continued to drive even after the accident, which

suggested that a warning from her doctor would not have altered her behavior. *Id.*; *see also* 992 N.E.2d at 675–76.

The Supreme Court's decision on transfer tracked the appellate court's (vacated) rationale in part. It is noteworthy that the Supreme Court did not explicitly address whether the physician owed a duty of care that extended to the plaintiff. It did, however, agree that there were factual disputes regarding proximate cause that required resolution at trial. *Id.* at 675–76. It also rejected the plaintiffs' belated contention that their claim against the physician was not one governed by the MMA. *Id.* at 674. The Court pointed out that the plaintiffs had treated it as one subject to the MMA by filing a copy of their complaint with the Department of Insurance. They could not belatedly argue otherwise. *Id.*[2]

Because the Supreme Court's decision in *Manley* did not address the subject of the physician's duty (if any) to the plaintiff or adopt the appellate court's holding on that point, it can be dismissed as irrelevant to whether a third party injured by a physician's treatment of another person may pursue relief for malpractice under the MMA—all the more so given that *Manley*'s holding as to the applicability of the MMA turned on an estoppel/waiver rationale. On the other hand, given that the Supreme Court (like the appellate court) reversed the trial court's dismissal of the claim and held that there were factual questions as to whether the physician's alleged malpractice was the proximate cause of harm to the

---

[2] *Preferred Prof. Ins. Co. v. West*, 23 N.E.3d 716, 732 (Ind. 2014), characterized the Indiana Supreme Court's holding in *Manley* on this point as a procedural ruling turning on waiver. *See also G.F. v. St. Catherine Hosp., Inc.*, 124 N.E.3d 76, 89 (Ind. Ct. App. 2019).

plaintiffs, *Manley* is, at the least, consistent with the notion that a third party can in some circumstances pursue a malpractice claim against a physician.

Cases in this line are to be contrasted with a separate line of cases exemplified by the decision in *Tarasoff v. Regents of Univ. of Cal.*, 551 P.2d 334 (Cal. 1976), which are premised not on a physician's duty to provide appropriate medical care to his patient, but instead upon an independent duty to protect third parties from violent, criminal harm that his patient might inflict on them. *See* Ind. Code § 34-30-16-1. The Indiana Appellate Court has held that a claim based on a breach of the latter duty is not one for medical malpractice that may be pursued under the MMA. "The purpose of the Malpractice Act is unrelated to the sort of liability a health care provider risks when a patient commits a criminal act against a third party." *Midtown Cmty. Mental Health Ctr. v. Estate of Gahl by Gahl*, 540 N.E.2d 1259, 1261-62 (Ind. Ct. App. 1989).

Cutchin presents his claim as one based on *Cram* (and *Manley*, for whatever relevance it may have) rather than *Tarasoff* and *Gaul*. In particular, Cutchin is alleging that the Physician's negligence in treating Watson (including the Physician's failure to monitor the effects of the prescribed medications and to warn Watson about the risks of driving) foreseeably injured not only Watson but others.[3] Cutchin is not

---

[3] The Fund suggests that the claim that *Cram* recognizes is not one for malpractice but for generic negligence. That suggestion is hard to reconcile with *Cram* itself, which describes the claim as one for medical malpractice. *See* 680 N.E.2d at 1096 ("the Court of Appeals affirmed the trial court's dismissal of a medical malpractice complaint under Indiana Trial Rule

alleging that the physician had an independent duty to warn others that Watson might harm them.

Apart from the question of whether the duty of care that a physician owes to his patient extends to third parties, there is a statutory question of whether a third party claiming the breach of such a duty qualifies as a "patient" who may seek relief under the MMA. As we noted earlier, the Act confines the right to file a complaint to "a patient or the representative of a patient" pursuing relief for injuries incurred as a result of medical malpractice. Ind. Code § 34-18-8-1. A second line of Indiana cases addresses this particular question.

*Spangler v. Bechtel*, 958 N.E.2d 458 (Ind. 2011), holds that the term "patient," as used in the MMA, can include persons whose claim is not derivative of an injury to the individual who was treated by the physician. The plaintiffs in *Spangler* were parents who, as relevant here, sued a hospital under the MMA for negligent infliction of emotional distress after their full-term baby daughter died *in utero* just prior to birth. The trial court dismissed that claim on the assumption that the parents' claim was necessarily derivative of an injury to their child: the court believed that an unborn child could not be treated as a "patient" under the MMA and consequently her parents could not pursue a derivative claim based on injuries to her. *See Ind. Patient's Comp. Fund v. Winkle*, 863 N.E.2d 1, 9–11 (Ind. Ct. App. 2007) (relied on by hospital in *Spangler* for proposition that stillborn fetus does not qualify as patient under MMA, thus precluding parents from pursing derivative claim arising from baby's death). The Indiana Supreme Court

12(B)(6)), *id.* at 1096-97 (referring to the actions taken by "the plaintiff in this medical malpractice case").

concluded that it was unnecessary to decide whether an un-born child might qualify as a patient for purposes of MMA, because the parents' claim for emotional injuries need not be understood as derivative of an injury to another person.

> Rather, such claims of emotional distress repre-sent injuries *directly* inflicted on a plaintiff and are not derivative in the traditional sense. The [MMA's] definition of "patient" is much broader than the "and other similar claims" language in-cluded in the description of derivative claims relied on by the *Winkle* court. The definition be-gins by providing that "patient" includes "a per-son having a *claim of any kind*, whether deriva-tive *or otherwise*, as a result of alleged malprac-tice on the part of a health care provider." Ind. Code § 34-18-2-22 (emphasis added). It is this language that assures the expansive applicabil-ity of the MMA—including the damage cap pro-vision—to a variety of actions alleging medical negligence. Claims for negligent infliction of emotional distress, if arising from alleged med-ical malpractice, are subject to the MMA not be-cause they are derivative but because they are "*otherwise*" *a result of alleged malpractice.* We do not read *Winkle* to preclude the plaintiffs' MMA actions for negligent infliction of emotional dis-tress from the stillbirth of their child. Thus a parent who suffers emotional distress from ex-periencing the birth of a lifeless child resulting from medical negligence is a "patient" subject to the MMA, but such claims need not be seen as "derivative" ones.

958 N.E.2d at 471–72 (emphasis in *Spangler*) (footnote omitted). *Spangler*, in short, adopted a broad reading of "patient" which does not necessarily require that a claimant either have been under the medical care of a provider or possess a claim derivative of an injury to such individual.

Putting *Spangler* together with *Cram*, it would appear that a person who is not a party to the doctor-patient relationship, but is nonetheless foreseeably injured as a consequence of a physician's malpractice, may be able to assert a malpractice claim under the MMA. *Cram* articulates the factors that bear on whether such a claim is viable under the particular circumstances of a case. *Spangler* in turn lends at least some support for the notion that a person who is not a party to the doctor-patient relationship may nonetheless seek relief for injuries that occur as a result of medical malpractice given the Act's broad articulation of who may constitute a "patient" for purposes of pursuing a malpractice claim.

Yet, the Indiana Court of Appeals' relatively recent decision in *Preferred Professional Insurance Co. v. West*, 23 N.E.3d 716 (Ind. Ct. App. 2014), indicates that a claimant like Cutchin does not qualify as a "patient" and therefore cannot pursue a claim under the MMA. The plaintiff in *West* was injured when the elevated platform on which she was working was struck and knocked over by a forklift driven by an individual taking a narcotic prescribed to him for pain relief. West and her husband sued the driver's healthcare providers, alleging that they were negligent in failing to advise the driver of the risks and side effects of his prescribed medication and to warn him that he should not be driving or operating heavy machinery while taking such medication. The Wests, in contrast to Cutchin, did not want to proceed under the MMA and did not

present their claim as one for medical malpractice; they sought a declaratory judgment to that effect which the trial court granted, reasoning that their claim was one for common law negligence rather than medical malpractice. The appeals agreed that the Wests' claim fell outside the coverage of the MMA. The court assumed that the alleged failure of the driver's healthcare providers to warn him about the dangers of operating heavy equipment while taking the narcotic pain reliever he was prescribed (a failure attributed in part to inadequacies in office record-keeping practices) constituted, at least in some measure, the provision (or denial) of medical care to the driver. *Id.* at 728–29. But the court concluded that West and her husband were not "patients" who could pursue claims under the MMA. Ms. West was not the person who had received health care treatment; the forklift driver was. *Id.* at 729. Although the Wests argued that they were persons who had "a claim of any kind, derivative or otherwise" based on the alleged malpractice committed by the driver's healthcare providers, the court did not believe that the broad language of the statutory definition of "patient" could be relied on to "eviscerate[ ] the initial requirement that a patient be an individual who receives or should have received health care from a provider." *Id.*

> We find that if we were to read the "or otherwise" language of the statute to expand the definition of "patient" to include anyone injured as a result of acts by anyone providing health care, it would effectively render the rest of the statute's language defining "patient" meaningless and without purpose. We do not believe the MMA was intended to cover claims by third

> parties having absolutely no relationship to the
> doctor or medical provider.

*Id.* at 730. The court went on to distinguish *Spangler* on the ground that the parents of the stillborn child in that case had a direct connection to the healthcare provider (indeed, the mother was treated by the same provider), whereas the Wests had no such connection. *Id.* The court agreed that the Wests might have "a valid general negligence claim based on a failure to warn" akin to the one at issue in *Gahl*; but because the Wests, like Gahl, had no prior relationship with the healthcare provider, it was not a claim reached by the MMA. *Id.* at 730–31.

The concurring judge in *West* gave even more weight to the claimants' status as persons wholly outside of the doctor-patient relationship:

> [T]he dispositive question is whether the MMA covers claims by a third party independent of the two people engaged in the medical give and take. I, like the majority, believe *Gahl* is instructive in answering this question. In *Gahl*, the claimant was the estate of a third party who was not warned by medical providers of the patient's dangerous propensities. The patient himself had no claim based on the appropriateness of his care, nor did anyone whose claim would have been derivative of the patient's. The third party in *Gahl* alleged the medical providers' negligence was a direct failure to warn *him* and yet we held he was not a patient asserting a claim governed by the MMA. Here, the Wests are a completely independent third party

> alleging a failure to warn *the patient* caused their
> injury. The relationship between the parties is
> even more distant in this case than it was in *Gaul*
> and lends further support to the conclusion that
> the Wests' claims are not subject to the MMA.

*Id.* at 733.

*West*'s rationale, to the extent it represents a correct application of the MMA and its definition of the term "patient," plainly forecloses Cutchin's ability to pursue relief within the MMA's framework. The underlying facts are quite similar to those presented in *West*, and Cutchin is the very sort of third party that *West* holds may not seek relief under the Act. As the Fund points out, in the six-plus years since it was decided, *West* has been neither criticized nor overruled.

Yet there are reasons to question whether *West* reached the right conclusion. *Cram*, as we have discussed, recognizes that a physician owes his patient a duty of care which in appropriate circumstances can extend to third parties who may be foreseeably harmed if the patient is not given appropriate warnings or monitoring as to the side effects of treatment. *Manley*, the facts of which are also similar to those presented here, may at least be said to have entertained such a third-party claim within the MMA framework, whatever the limits of its express rationale. *West*, although it cites both *Cram* and *Manley*, neither discusses *Cram*'s analysis of the duty a physician owes to third parties nor attempts to reconcile that analysis with its conclusion that third parties may not seek relief under the MMA. The *West* majority opinion acknowledges that a third-party claim of the sort Cutchin presents here is one that implicates the physician's skill and expertise in caring for his patient; and contrary to the reasoning of the *West*

concurrence, the physician's patient would benefit from the particular duty for which the third-party claimant advocates here. (The claimed negligence in this case allegedly resulted in the deaths not only of Cutchin's wife and daughter, but Watson herself.)

Of course, neither *Cram* nor *Manley* construed the Act's language defining who constitutes a "patient" who may pursue relief under the MMA. The Supreme Court in *Manley* addressed the proximate cause issue without addressing (as the appellate court had) the antecedent question as to the viability of a malpractice claim pressed by a third party who was not in the care of the physician; that court also resolved the applicability of the MMA to the claim based solely on an estoppel/waiver rationale. It may be that third parties injured as a result of a physician's breach of the duty of care to his patient have a claim for malpractice, but one that can and must be pursued outside the confines of the MMA, *i.e.*, without the ability to pursue relief from the Fund and without any caps on the damages recoverable from the provider. (The Fund itself draws a distinction between medical malpractice and "statutory medical malpractice." Fund Br. 47.) *But see Thompson v. Cope*, 900 F.3d 414, 427 (7th Cir. 2018) (applying Indiana law) ("Regardless of labels, claims that boil down to a question of whether a given course of treatment was medically proper and within the appropriate standard are the quintessence of a malpractice case. By contrast, to fall outside the Malpractice Act a health care provider's actions must be demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment.") (cleaned up); *Sue Yee Lee v. Lafayette Home Hosp., Inc.*, 410 N.E.2d 1319, 1324 (Ind. Ct. App. 1980) ("Since the obvious purpose of the act is to provide some measure of

protection to health care providers from malpractice claims, and to preserve the availability of the professional services of physicians and other health care providers in the communities and thereby protect the public health and well-being, it is totally inconceivable that the legislature intended to extend this protection only to actions wherein the actual patient was the party plaintiff and to exclude other claims for medical malpractice wherein the plaintiff was not the actual patient, but one whose right of action was derived from the patient such as the parents' claim here").

If indeed a third-party claim for malpractice must be pursued outside of Indiana's statutory malpractice framework, as if it were a generic claim for negligence, then we are presented with the very dichotomy that Cutchin has identified: a person under the medical care of a physician may obtain relief for malpractice under the procedural constraints of the MMA and up to the limits that the Act imposes, whereas a third party injured as a result of the very same malpractice may seek relief outside of the MMA, with no such constraints at all.[4] It seems unlikely that the Legislature would have intended this result.

Avoiding precisely this sort of dichotomy may also explain the legislature's use of language like "claim of any kind" and "derivative or otherwise" in defining the term "patient." The Indiana Supreme Court's decision in *Spangler* is certainly consistent with a generous approach in applying that

---

[4] For its part, the Fund raises the specter of any number of remote tort victims attempting to sue under the MMA simply because they came into contact with, and were injured by a patient treated by a healthcare provider. Fund Br. 33.

definition. 958 N.E.2d at 472. True, the circumstances in *Spangler* may be distinguished for precisely the reasons that *West* articulated. But *West* does not answer the question why, as a matter of logic, when a physician's malpractice proximately causes injuries not just to his patient but also to a third party whom the patient encountered, *both* may not seek relief for the malpractice under the MMA.

These questions leave us uncertain as to precisely how a negligence claim like the one that Cutchin pursues should be treated. The scenario underlying his claim may not be one that occurs frequently, but as cases like *Cram* and *Manley* reveal, it is one that recurs. The viability of Cutchin's claim turns exclusively on Indiana law as established by both the terms of the MMA and the Indiana cases interpreting those terms. It is important to the courts and citizens of Indiana that the questions presented be answered authoritatively.

Our Circuit Rule 52(a) provides:

> When the rules of the highest court of a state provide for certification to that court by a federal court of questions arising under the laws of that state which will control the outcome of a case pending in the federal court, this court, sua sponte or on motion of a party, may certify such a question to the state court in accordance with the rules of that court, and may stay the case in this court to await the state court's decision of the question certified. The certification will be made after the briefs are filed in this court. A motion for certification shall be included in the moving party's brief.

Indiana Rule of Appellate Procedure 64 allows for the certification of questions of Indiana law by federal courts to the Indiana Supreme Court.

Certification is appropriate in a case where the question to be certified is outcome determinative, where it concerns an important issue of public concern, where the state supreme court has not yet provided clear guidance on the matter, and where the issue is likely to recur. *See Tammi v. Porsche Cars N.A., Inc.*, 536 F.3d 702, 713 (7th Cir. 2008); *see also McKesson v. Doe*, 141 S. Ct. 48, 50–51 (2020); *United States v. Franklin*, 895 F.3d 954, 961 (7th Cir. 2018) (per curiam); *Bernstein v. Bankert*, 733 F.3d 190, 221 (7th Cir. 2013). We also take into account the state supreme court's particular interest in the development of state law and the likelihood that the result of the decision in a particular case will exclusively affect the citizens of that state. *Tammi*, 536 F.3d at 713 (quoting *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 672 (7th Cir. 2001)).

This case presents questions that turn on the meaning and operation of the terms of the MMA, an Indiana statute which establishes a comprehensive scheme for the resolution of medical malpractice claims in Indiana. The answers to these questions will be outcome determinative: if, for example, Cutchin does not qualify as a "patient" under the MMA, then he may not assert a claim against the Fund. The issues underlying these questions are likely to recur, as it is hardly unusual for someone taking a medication prescribed by a physician to experience side effects that may interfere with her ability to operate a motor vehicle and result in injuries to third parties. Indeed, the existing body of Indiana case law reveals the recurrence of this scenario. Whether the MMA and the recovery limits it imposes apply to third-party claims like the one

presented by Cutchin has important ramifications not only for claimants but for Indiana healthcare providers and malpractice insurers. The Indiana Supreme Court has experience and expertise with these issues that we do not and has a unique interest in the development of Indiana law. And the bench, bar, and citizenry of Indiana have a particular and compelling interest in the correct answers to the questions presented in this case.

## III.

For the reasons discussed above, we certify the following two questions to the Indiana Supreme Court:

> 1. Whether Indiana's Medical Malpractice Act prohibits the Patient's Compensation Fund from contesting the Act's applicability to a claim after the claimant concludes a court-approved settlement with a covered health care provider.
>
> 2. Whether Indiana's Medical Malpractice Act applies to claims brought against qualified providers for individuals who did not receive medical care from the provider, but who are injured as a result of the provider's negligence in providing medical treatment to someone else.

We submit these questions with respect and with the hope that the Court will lend us its guidance in agreeing to answer these questions. Resolution of the merits of this appeal is stayed pending the Indiana Supreme Court's decision.

QUESTIONS CERTIFIED TO
INDIANA SUPREME COURT