In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1562
INDIANA RIGHT TO LIFE VICTORY FUND and SARKES TARZIAN,
INC.,
 Plaintiffs-Appellants,

 v.

DIEGO MORALES, et al.,
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Indiana, Indianapolis Division.
 No. 1:21-cv-2796 — Sarah Evans Barker, Judge.
 ____________________

 ARGUED DECEMBER 2, 2022 — DECIDED APRIL 26, 2023
 ____________________

 Before EASTERBROOK, SCUDDER, and LEE, Circuit Judges.
 SCUDDER, Circuit Judge. Political action committees play a
large role in today’s political campaigns. PACs accept cam-
paign contributions from donors and spend that money to
support or oppose political candidates, parties, or ballot initi-
atives. An independent-expenditure PAC—commonly called
a “super PAC”—is a special kind of PAC that spends its
money a little differently than most PACs. Unlike the others,
2 No. 22-1562

independent-expenditure PACs do not give money directly to
candidates, party committees, or ballot-initiative movements.
Rather, they spend the money themselves to advocate for or
against candidates, parties, or initiatives.
 Indiana Right to Life Victory Fund wants to operate as an
independent-expenditure PAC in Indiana, but it fears that the
state’s Election Code does not allow it to accept donations
from corporations (or perhaps that there would be a cap on
how much those corporations could donate). The Fund be-
lieves this restriction violates its First Amendment rights, so
it and a private company have come to federal court seeking
to prevent Indiana from enforcing its campaign-finance laws
to limit or ban corporate contributions to independent-
expenditure PACs. The wrinkle is that Indiana’s election offi-
cials say they have no intent to enforce their laws that way
and, more to the point, do not even think their laws could be
enforced that way either under the plain text of the Election
Code or without violating the First Amendment.
 We cannot decide whether the Fund has standing to chal-
lenge the Indiana Election Code without first determining the
Code’s meaning. But that inquiry entails its own complexity,
as Indiana courts have not yet interpreted the provisions at
issue, and the parties have both advanced credible arguments
in support of their positions. In these circumstances, the most
prudent course is to invite the opinion of the only body that
can definitively construe the Indiana Election Code—the In-
diana Supreme Court. Doing so respects important principles
of federalism and ensures an authoritative answer to this un-
settled, important, and likely dispositive issue. So we certify
the question set forth in this opinion to the Indiana Supreme
Court.
No. 22-1562 3

 I
 A
 Indiana’s campaign-finance laws allow corporations to
“make a contribution to aid in the election or defeat of a can-
didate or the success or defeat of a political party or a public
question.” Ind. Code § 3-9-2-3(a). But corporate contributions
“are limited to those authorized by sections 4, 5, and 6 of this
chapter.” § 3-9-2-3(b). The Fund challenges sections 4 and 5.
 Section 4 imposes annual limits on direct corporate contri-
butions to candidates and party committees. A corporation,
for example, may not make annual contributions “in excess
of” $5,000 to candidates for statewide elected office.
§ 3-9-2-4(1). But section 4 is silent on other kinds of political
expenditures. It imposes no cap on corporate contributions to
committees unaffiliated with a political party, such as PACs.
See id.; see also § 3-5-2-37(3) (distinguishing party committees
from PACs). It also does not limit how much corporations can
spend on their own to advocate for or against a candidate or
political party.
 Section 5 ensures that corporations cannot use PACs as a
loophole to avoid contribution caps. It does this by requiring
corporations to designate their contributions to PACs “for
disbursement to a specific candidate or committee listed un-
der section 4.” § 3-9-2-5(c)(2). These contributions, in turn,
must abide by the annual limits established in section 4. See
§ 3-9-2-5(a), (c)(1). Yet section 5 does not address how or
whether a corporation could earmark a contribution for a
PAC to spend itself (as an independent expenditure) for or
against a candidate or party.
4 No. 22-1562

 Section 6 provides limited exceptions to the restrictions in
sections 4 and 5 for certain nonpartisan registration and get-
out-the-vote campaigns, contributions made by nonpartisan
PACs, and contributions regarding public questions. See
§ 3-9-2-6. The Fund does not challenge section 6.
 Notice what is missing. No provision of Indiana’s cam-
paign-finance laws purports to regulate corporations’ inde-
pendent expenditures. Nor does any provision describe how
PACs that engage in independent expenditures are regu-
lated—if they are regulated at all. Indeed, the very concept of
independent expenditures, whether by a corporation or by a
PAC, seems absent from the plain text of the Indiana Election
Code.
 B
 The Fund asserts that the Election Code prohibits corpo-
rate contributions to independent-expenditure PACs. It gets
there through the statutory admonition that corporate contri-
butions “are limited to those authorized by sections 4, 5, and
6.” § 3-9-2-3(b). Section 4 only addresses contributions to spe-
cific candidates or committees, section 5 only addresses con-
tributions to PACs that are earmarked for disbursement, and
section 6 does not provide any relevant exceptions. Synthesiz-
ing these three provisions, the Fund contends that Indiana
law disallows corporate contributions to independent-
expenditure PACs.
 Indiana’s election officials disagree. They assert that cor-
porations’ independent expenditures—whether made di-
rectly or through PACs—“fall outside” the campaign-finance
regulations. So they contend that the Election Code simply
“does not regulate” independent expenditures. The upshot of
No. 22-1562 5

this position would be that anyone can make independent ex-
penditures or donate to an organization that does so without
running afoul of state law. As further support for their posi-
tion, Indiana’s election officials contend that their interpreta-
tion of the Election Code is consistent with the Supreme
Court’s decision in Citizens United v. FEC, 558 U.S. 310 (2010),
and our decision in Wisconsin Right to Life State Political Action
Committee v. Barland, 664 F.3d 139 (7th Cir. 2011) (Barland I)—
two decisions that addressed how the First Amendment pro-
tects corporate speech related to political campaigns.
 C
 The Fund and its coplaintiff, a company called Sarkes
Tarzian, do not buy Indiana’s position. Sarkes worries that the
Election Code prohibits it from contributing to independent-
expenditure PACs, so it has not contributed anything. For its
part, the Fund fears that contributions will dry up (or never
materialize in the first place). The Fund further insists that the
First Amendment protects a corporation’s right to make un-
limited contributions to independent-expenditure PACs. That
is why it and Sarkes invoked 42 U.S.C. § 1983 and sued Indi-
ana state officials tasked with enforcing the Election Code—
including Secretary of State Diego Morales, Attorney General
Todd Rokita, and members of the Indiana Election Commis-
sion—for violating their constitutional rights.
 Indiana has not yet enforced its Election Code against the
Fund or any of its donors, though, making this lawsuit a
preenforcement challenge. A plaintiff may bring such a chal-
lenge only if they can allege a “credible threat” that the law
will be enforced against them. See Sweeney v. Raoul, 990 F.3d
555, 559 (7th Cir. 2021) (quoting Babbitt v. United Farm Workers
National Union, 442 U.S. 289, 298 (1979)). Because the Fund
6 No. 22-1562

reads the Election Code to prohibit corporate contributions to
independent-expenditure PACs, it contends the very text of
the statute establishes a credible threat that Indiana will en-
force the statute against it and its donors. Indiana’s election
officials disagree. In addition to their interpretation of the
statute, which would allow the activity the Fund is worried
about, they highlight that several election officials have pub-
licly disavowed any intent to enforce the Election Code
against corporate contributions to independent-expenditure
PACs. So they say there is no credible threat.
 The district court found that the Fund had not alleged a
credible threat. Two considerations were particularly im-
portant to its conclusion. The district court first stressed that
Citizens United interpreted the First Amendment to forbid
limits on independent expenditures, and so the court viewed
the Fund’s desired activity as falling under the First Amend-
ment protection recognized by the Supreme Court. From
there the district court observed that every Indiana election
official on the record has stated that the Election Code does
not regulate independent expenditures or prohibit corporate
contributions to independent-expenditure PACs—and in-
deed has disavowed any intent to enforce the statute in any
way inconsistent with that interpretation. Crediting the state
officials’ position, the district court dismissed the lawsuit for
lack of standing.
 The Fund and Sarkes now appeal.
 II
 Take a moment to observe how the table is set here. The
Fund has come into federal court requesting that we declare
Indiana’s limits on corporate campaign contributions
No. 22-1562 7

unconstitutional as applied to independent-expenditure
PACs. But Indiana’s election officials insist the Election Code
does not restrict corporate contributions to independent-
expenditure PACs—and, even if it did, the officials say they
would not enforce it in that manner because they believe do-
ing so would be unconstitutional under Citizens United and
Barland I. They therefore see no real conflict with the Fund’s
wishes and think there is nothing for us to do here.
 That sounded alarm bells for the district court, and it does
for us too. Article III “limits federal courts to resolving con-
crete disputes between adverse parties.” Sweeney, 990 F.3d at
559. A plaintiff challenging a statute must “assert an injury
that is the result of a statute’s actual or threatened enforcement,
whether today or in the future.” California v. Texas, 141 S. Ct.
2104, 2114 (2021) (emphasis in original). For a preenforcement
challenge like this one, the touchstone is whether the plaintiff
has alleged “a credible threat of prosecution” under the stat-
ute. Babbitt, 442 U.S. at 298. If they have not, federal courts
lack subject-matter jurisdiction—the authority to hear the
case—no matter how strong the merits position may be on ei-
ther side. See Sweeney, 990 F.3d at 559 (explaining that a justi-
ciable case is one that presents an “actual controvers[y] be-
tween someone who has experienced (or imminently faces)
an injury and another whose action or inaction caused (or
risks causing) that injury”). We must address these jurisdic-
tional questions before we can even consider the merits. See
Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 93–95 (1998).
 A
 The election officials’ first reason why the Fund has failed
to allege a credible threat of enforcement is that the Election
Code does not cover corporate contributions to independent-
8 No. 22-1562

expenditure PACs—the very conduct Sarkes and the Fund
wish to engage in. If true, that would indeed mean the Fund
lacks standing to bring its preenforcement challenge. It is a
threshold requirement to establish a credible threat of en-
forcement that the statute actually cover the plaintiff’s desired
conduct. See Babbitt, 442 U.S. at 298 (explaining a plaintiff
must allege “an intention to engage in a course of conduct ar-
guably affected with a constitutional interest, but proscribed by
a statute” (emphasis added)). Even in the First Amendment
context, where courts are wary of the “chilling effect” that un-
duly vague statutes can have, a plaintiff must show that the
statute at least “arguably” covers their desired conduct.
Shirmer v. Nagode, 621 F.3d 581, 586–87 (7th Cir. 2010).
 The officials advance some valid arguments in favor of
their interpretation of the Election Code. They explain that the
Code’s silence on independent expenditures means it does
not regulate them at all, regardless of whether they are made
by a corporation directly or through a PAC. That interpreta-
tion appears consistent with the Supreme Court’s admoni-
tions that courts should not overread statutory silence, espe-
cially when doing so would impose criminal or regulatory
penalties. See, e.g., Concepcion v. United States, 142 S. Ct. 2389,
2402 (2022) (sentencing context); Samantar v. Yousuf, 560 U.S.
305, 317 (2010) (sovereign immunity context); Toibb v. Radloff,
501 U.S. 157, 161 (1991) (bankruptcy context).
 Yet the Fund—arguing, seemingly against its self-interest,
that the Election Code does restrict corporate contributions to
independent-expenditure PACs—presses some sound points
of its own. The Election Code’s plain text states that corporate
contributions “are limited to those authorized by sections 4,
5, and 6.” § 3-9-2-3(b). But sections 4, 5, and 6 do not authorize
No. 22-1562 9

independent expenditures (at least, not in express terms).
And the Fund reminds us that we cannot “adopt a narrowing
construction of a state statute unless such a construction is
reasonable and readily apparent.” Wisconsin Right to Life, Inc.
v. Barland, 751 F.3d 804, 833 (7th Cir. 2014) (Barland II) (quot-
ing Stenberg v. Carhart, 530 U.S. 914, 944 (2000)). We are there-
fore hesitant to constrain state law too quickly—even at the
behest of state officials.
 B
 For now, then, we put a pin in this unresolved question of
statutory interpretation and turn to the election officials’ sec-
ond reason why the Fund has failed to allege a credible threat
of enforcement. Relying on our decision in Lawson v. Hill, they
assert that if a statute is “clearly unconstitutional, either en-
tirely so or as applied to the plaintiff’s conduct,” there can be
no credible threat that the statute will be enforced in the un-
constitutional manner. 368 F.3d 955, 957 (7th Cir. 2004).
 But that inquiry is not so straightforward either. In Lawson
the plaintiff sued to enjoin enforcement of a statute criminal-
izing the desecration of the U.S. flag, something the Supreme
Court specifically addressed in Texas v. Johnson, 491 U.S. 397
(1989), and United States v. Eichman, 496 U.S. 310 (1990). We
are not so sure that Citizens United and Barland I address cor-
porate contributions to independent-expenditure PACs with
a similar level of specificity. Nor is it apparent how clearly
unconstitutional a statute must be to eliminate a credible
threat that it will be enforced.
 That Indiana’s election officials have disclaimed any in-
tent to enforce the Election Code to regulate corporate contri-
butions to independent-expenditure PACs does not change
10 No. 22-1562

our analysis. State officials’ affirmative expressions of intent
to enforce a statute may certainly give rise to a credible threat.
See, e.g., Steffel v. Thompson, 415 U.S. 452, 459 (1974). So would
state officials’ refusals to disavow enforcement when given
the opportunity to do so. See, e.g., Holder v. Humanitarian L.
Project, 561 U.S. 1, 16 (2010) (“The Government has not argued
… that plaintiffs will not be prosecuted if they do what they
say they wish to do.”); Babbitt, 442 U.S. at 302 (“[T]he State has
not disavowed any intention of invoking the criminal penalty
provision against unions [like the plaintiffs].”).
 But state officials’ promises not to enforce a statute receive
less weight, especially when they cannot bind their successors
in office. See Trustees of Indiana Univ. v. Curry, 918 F.3d 537,
540 (7th Cir. 2019). It is only “when a state agency acknowl-
edges that it will not enforce a statute because it is plainly un-
constitutional” that such statements might mean anything at
all. Wisconsin Right to Life, Inc. v. Schober, 366 F.3d 485, 492 (7th
Cir. 2004) (emphasis added). That comes full circle to whether
the statute is “plainly”—or “clearly,” to use Lawson’s termi-
nology—unconstitutional.
 C
 What all this means is that the Fund’s standing to bring
this case is in serious question. On the one hand, Indiana’s
Election Code may not even regulate the Fund’s desired con-
duct, meaning the Fund would face no credible threat of an
injury. But resolving this question would require us to inter-
pret an Indiana state statute where both sides have advanced
credible positions. On the other hand, Indiana officials say
they will not enforce the Election Code in the way that con-
cerns the Fund. But whether we credit those representations
depends on a fine-grained constitutional analysis of the
No. 22-1562 11

holdings of Citizens United and Barland I, for only then can we
know whether the Fund faces a credible threat of enforce-
ment. See Lawson, 368 F.3d at 957; Schober, 366 F.3d at 492. In
short, there is no easy answer.
 The Supreme Court has instructed that, in situations like
this one, federal courts must “ensure that any conflict … be-
tween state law and the First Amendment is not purely hypo-
thetical.” Mckesson v. Doe, 141 S. Ct. 48, 51 (2020) (per curiam).
To that end, when we are faced with both statutory and consti-
tutional questions, we must prioritize resolving the statutory
issues if doing so would prevent us from engaging in unnec-
essary constitutional analysis. See Ashwander v. TVA, 297 U.S.
288, 347 (1936) (Brandeis, J., concurring) (observing that, as a
general rule, “if a case can be decided on either of two
grounds, one involving a constitutional question, the other a
question of statutory construction or general law, the Court
will decide only the latter”). This course of action is more, not
less, important when the statute at issue is a state statute. See
Arizonans for Official English v. Arizona, 520 U.S. 43, 75 (1997)
(recognizing the need for “respect for the place of the States
in our federal system”). So the Supreme Court has offered the
following observation: “[W]e think it much better to decide [a
case] with regard to the question of a local nature … rather
than to unnecessarily decide the various constitutional ques-
tions appearing in the record.” Hagans v. Lavine, 415 U.S. 528,
546 (1974) (quoting Siler v. Louisville & Nashville R.R. Co., 213
U.S. 175, 193 (1909)).
 Heeding this guidance, we decline at this time to resolve
the constitutional debate over how to best interpret Citizens
United and Barland I. Instead, we return to the statutory
12 No. 22-1562

question whether the Indiana Election Code restricts corpo-
rate contributions to independent-expenditure PACs.
 III
 The Supreme Court has further explained that sometimes
the best way to resolve a difficult question of state law is
through certification to the state’s highest court, which alone
can give an authoritative interpretation of state law. See
Mckesson, 141 S. Ct. at 51; Arizonans for Official English, 520 U.S.
at 78–79. Indiana permits “any federal circuit court of ap-
peals” to certify any “question of Indiana law … that is deter-
minative of the case and on which there is no clear controlling
Indiana precedent.” Ind. R. App. P. 64(a). We have concluded
that certification to the Indiana Supreme Court is the best
course of action here.
 A
 The question we certify—whether the Indiana Election
Code prohibits or otherwise limits corporate contributions to
independent-expenditure PACs—satisfies Indiana’s require-
ments for certification:
 First, interpreting an Indiana statute is without a doubt a
question of Indiana law. See In re Hernandez, 918 F.3d 563, 569
(7th Cir. 2019).
 Second, answering the question will likely resolve the case.
If the Election Code does not regulate the kind of activity the
Fund and Sarkes wish to engage in, they lack a credible threat
of enforcement, and we must affirm the district court’s dis-
missal for lack of standing. Of course, we acknowledge that
we have not yet resolved the constitutional dimension to the
officials’ challenge to the Fund’s standing. Indiana’s argu-
ments on that front—that Citizens United and Barland I
No. 22-1562 13

eliminate any credible threat of enforcement—may still pre-
vail. But the U.S. Supreme Court’s guidance remains: in cases
like this one, “certification is advisable before addressing a
constitutional issue.” Mckesson, 141 S. Ct. at 51. Answering the
statutory question is therefore “key to a correct disposition of
the case” regardless of the remaining constitutional issues.
Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co., 732 F.3d 755,
766 (7th Cir. 2013).
 Third, there is no controlling Indiana precedent resolving
the statutory question. Indeed, it does not appear that any
state court has addressed this issue. There are sound argu-
ments on both sides. These realities make the Indiana Su-
preme Court best situated to interpret the Election Code and
itself apply the “cardinal principle” that the statute should be
construed “within constitutional bounds” if possible. Arizo-
nans for Official English, 520 U.S. at 78.
 B
 Certification presents other advantages as well. The dis-
pute “concerns an important issue of public concern” that is
“likely to recur,” increasing the value of certification. Cutchin
v. Robertson, 986 F.3d 1012, 1028 (7th Cir. 2021). Independent-
expenditure PACs have become increasingly common since
Citizens United, see Michael S. Kang, The Year of the Super PAC,
81 Geo. Wash. L. Rev. 1902, 1904–08 (2013), and there is every
reason to think they will continue to grow in number and im-
portance. When deciding whether to certify a question “[w]e
also take into account the state supreme court’s particular in-
terest in the development of state law and the likelihood that
the result of the decision in a particular case will exclusively
affect the citizens of that state.” Cutchin, 986 F.3d at 1028–29.
Indiana’s election officials and its citizens would uniquely
14 No. 22-1562

benefit from an authoritative statement from its supreme
court proscribing how state law regulates these PACs.
 Atop everything else, the procedural posture of this ap-
peal—a preenforcement challenge to a state statute—only
bolsters our choice. “Warnings against premature adjudica-
tion of constitutional questions bear heightened attention
when a federal court is asked to invalidate a State’s law, for
the federal tribunal risks friction-generating error when it en-
deavors to construe a novel state Act not yet reviewed by the
State’s highest court.” Arizonans for Official English, 520 U.S. at
79; see also Lawson, 368 F.3d at 960 (observing that unneces-
sary preenforcement relief “would place humiliating and po-
tentially paralyzing restrictions” on state actors). That is why
the Supreme Court has instructed federal courts to certify
questions when doing so “would ensure that any conflict …
between state law and the First Amendment is not purely hy-
pothetical.” Mckesson, 141 S. Ct. at 51. We should not invali-
date a statute as unconstitutional unless we can be sure what
the statute means in the first place.
 C
 For these reasons, we respectfully request that the Indiana
Supreme Court exercise its discretion to answer the following
certified question:
 Does the Indiana Election Code—in particular,
 §§ 3-9-2-3 to -6—prohibit or otherwise limit cor-
 porate contributions to PACs or other entities
 that engage in independent campaign-related
 expenditures?
No. 22-1562 15

Nothing in this opinion should be construed to limit the Indi-
ana Supreme Court’s inquiry, and we welcome the Justices
reformulating the question to suit their review.
 The question is CERTIFIED. All further proceedings in
this Court are STAYED while the Indiana Supreme Court con-
siders this matter.